# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE

NEWS RELEASE #051

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **15th day of October, 2014**, are as follows:

**BY WEIMER, J.**:

2013-C -2637
C/W
2013-C -2717

OLYMPIA MINERALS, LLC, ET AL. v. HS RESOURCES, INC., ET AL. (Parish of Beauregard)

We find no error in the conclusion that Olympia did not properly raise this issue in the district court; and, like the court of appeal, we decline to reach this issue in the first instance in this court.
AFFIRMED IN PART; REVERSED IN PART; AMENDED IN PART; AND REMANDED TO THE COURT OF APPEAL.

SUPREME COURT OF LOUISIANA

NO. 2013-C-2637 c/w 2013-C-2717

OLYMPIA MINERALS, LLC, ET AL.

VERSUS

HS RESOURCES, INC., ET AL.

*ON WRIT OF CERTIORARI TO THE COURT OF APPEAL, THIRD CIRCUIT,
PARISH OF BEAUREGARD*

**WEIMER**, Justice.

We granted a writ to review the correctness of the lower courts' interpretation of portions of a written mineral agreement. The agreement was prepared by a mineral leaseholder and ostensibly conveyed to an exploration company an "exclusive option to sublease" at least 15 percent of the leaseholder's mineral rights. The lower courts interpreted the agreement as imposing an *obligation* on the exploration company to execute the sublease rather than simply allowing the exploration company the *right* to execute the sublease. Because the exploration company did not execute such a sublease, the lower courts awarded damages to the leaseholder for breach of contract.

When we granted the writ, it was apparent that the lower courts had awarded to the leaseholder other damages, related to the exploration company's *obligation* to execute a mineral sublease. Thus, the viability of those damage awards also depends on whether the lower courts' rulings that there was an obligation to sublease is correct.

For the reasons that follow, we determine that the lower courts erred in ruling that the exploration company was obligated by the agreement to sublease mineral

rights. Instead, we find the agreement afforded the exploration company a non-binding option to sublease (for which the exploration company paid $1.4 million), but that if the exploration company exercised the non-binding option, it was then obligated to sublease at least 15 percent of the leaseholder's rights described in the agreement. Accordingly, we reverse the damage award on the breach of contract claim for failing to sublease at least 15 percent of the leaseholder's mineral rights. However, we also find the exploration company breached its obligation to complete a seismic survey, and we affirm the corresponding award of damage.

Because we find the record does not support a finding that the exploration company acted in bad faith, we examine the effects of a contractual prohibition against consequential damages that the lower courts refused to apply based on those courts' findings of bad faith. Pretermitted by legal error in the court of appeal, however, was any meaningful review of the merits of the exploration company's argument that its reconventional demand for improper use and sharing of its seismic data was improperly dismissed. We remand to the court of appeal the question of the propriety of that dismissal and, as that court then deems necessary, the question of whether the record supports the exploration company's request for relief, or whether remanding to the district court for the taking of additional evidence is required. Finally, we agree with the court of appeal that the leaseholder's request for attorneys' fees was properly pretermitted; such request was not properly raised in the district court.

**FACTS AND PROCEDURAL HISTORY**

In 2000, El Paso Minerals and El Paso Minerals Leasing (collectively "El Paso") held mineral rights in approximately 42,000 mineral acres located in Beauregard and Calcasieu Parishes. Effective August 1, 2000, El Paso entered into the "NORTH

2

STARKS PROJECT AGREEMENT" with two other businesses, Aspect Resources, LLC, and HS Resources, Inc, which paid $1.4 million as part of the contract.

The agreement described three topics that are relevant to this court's inquiry. First is the agreement's provisions for subleasing mineral rights held by El Paso.[1] Second, the agreement described seismic surveys within approximately 135 square miles of lands in Beauregard and Calcasieu Parishes to be undertaken by Aspect Resources and HS Resources. Third, the agreement described ownership details of the seismic data, as well as the form and conditions by which Aspect Resources and HS Resources would provide results to El Paso of the seismic surveys. Although the agreement will be covered in greater detail within this opinion, for present background purposes, the seismic data would be owned by Aspect Resources and HS Resources, with El Paso receiving a long-term, nontransferable license to use the data, including both computer-processed data and unprocessed "raw" or "field" data under strict conditions of confidentiality.

The "NORTH STARKS PROJECT AGREEMENT" had a term of one year. As of July 31, 2001, Aspect Resources and HS Resources had only surveyed the southern half of the property and delivered not the "raw" or "field" data, but the "processed" seismic data to El Paso. Aspect Resources and HS Resources had not subleased any of the property. HS Resources, on behalf of itself and Aspect Resources, requested a six-month extension to complete the survey of the property, but El Paso declined. The parties went their separate ways, seemingly without

---

[1] The "NORTH STARKS PROJECT AGREEMENT" indicates that some of El Paso's mineral rights were not leased; instead, they were acquired by other means not described in the agreement. There are a variety of means of acquiring mineral rights that are theoretically possible. Therefore, for simplicity and given the certainty that some of El Paso's rights were held by lease, this opinion uses the term "sublease" to reflect the potential method of transferring mineral rights from El Paso to Aspect Resources. In the agreement at issue, although "lease" is sometimes employed as describing the potential method of transferring mineral rights, the term "sublease" is the term most often used.

complaint. Even though Aspect Resources ultimately leased some of the property after the agreement's term, the relative quiet attending the end of the agreement's term did not last long.

Two years after the agreement expired, in October 2003, Texas investors acquired ownership of El Paso and restructured and renamed it Olympia Minerals, LLC. Other oil companies became interested in leasing portions of the property that had been the subject of the "NORTH STARKS PROJECT AGREEMENT." Olympia contracted with Heights Energy in Dallas to house Aspect Resource's seismic data, and the files were moved to a special room for the purpose of analysis by Olympia's potential partners. Several companies set up work stations to "work" the seismic data; these parties had virtually unfettered access to the data room and all files. In other words, Olympia made the confidential seismic data available to numerous other entities in apparent violation of the seismic data license agreement, which imposed restrictions on the use and dissemination of the data for a term of 49 years.

One of the entities, Wiser Oil, wanted more seismic information. Olympia spent some time trying to locate the field data within El Paso's files before realizing the raw data was not included. Olympia then requested the raw data from Aspect Resources and HS Resources. For months, frustration ensued as personnel newly involved as a result of El Paso's restructuring as Olympia grappled with what data Olympia possessed and what data it may be entitled to acquire from Aspect Resources and HS Resources. Apparently, there was confusion by all involved as to which of several contracts governed, as there were several contracts covering different acreages in the region. Eventually, Aspect Resources and HS Resources realized that the "NORTH STARKS PROJECT AGREEMENT," which was more restrictive than another

4

agreement originally thought applicable, covered the property in question. In October 2004, HS Resources sent Olympia a cease and desist letter regarding Olympia's sharing of the seismic data.

Settlement negotiations ensued, but on September 22, 2005, Olympia filed suit against Aspect Resources and HS Resources (defendants).[2] In its suit, Olympia contended that the "NORTH STARKS PROJECT AGREEMENT" did not merely afford defendants the right to sublease mineral interests, but the agreement actually obligated defendants to sublease at least 15 percent of Olympia's (earlier El Paso's) mineral interests. Olympia sought the following monetary damages: $1,551,927.38 for failure to select and execute mineral subleases; $8,325,000 to survey the 111 square miles that had allegedly not been surveyed; an unspecified amount for delay in development of properties to which Olympia held mineral rights. Olympia also sought a declaration of dissolution of the "NORTH STARKS PROJECT AGREEMENT" effective on the date of the first major breach by defendants and an order directing defendants to relinquish all seismic data to Olympia free and clear of any licensing restrictions.

Defendants answered, denying liability for damages and the other forms of relief sought. Defendants also filed reconventional demands, seeking recognition that the seismic survey data was owned by defendants and was subject to a restrictive license agreement. In their reconventional demands, defendants also alleged violations of Louisiana's Uniform Trade Secrets Act and Unfair Trade Practices Act.

---

[2] By this time, HS Resources had been acquired by Kerr-Magee Oil & Gas Onshore, LP, which was also named as a defendant. Because salient aspects of the record refer to HS Resources, notwithstanding that entity's subsequent acquisition by Kerr-Magee, this opinion will continue to use the name HS Resources.

<u>The District Court Rulings</u>

In November 2007, Olympia filed a partial motion for summary judgment, limited to Olympia's contention that the agreement did not merely afford a right but instead imposed an obligation upon HS Resources and Aspect Resources to sublease at least 15 percent of El Paso's mineral holdings described in the agreement.[3] The district court judge found the agreement contained an elective right and not an obligation to sublease, stating:

> The Court is of the opinion that when the ["NORTH STARKS PROJECT AGREEMENT"] is read in its entirety, the only logical conclusion is that [defendants] had a right to exercise an option to lease and if elected [were] required to lease a minimum of 15 percent of the El Paso lands.
> <u>The reading of the document suggested by the movant [Olympia] is simply too tortured to be convincing</u> to the Court and indeed requires more rewriting and parsing of the language [in the] agreement than does the reading advanced by the respondent[s].[4] [Emphasis added.]

Therefore, Olympia's motion was denied.

Following the retirement of the district court judge handling this matter, defendants, on October 14, 2008, filed their own partial motion for summary judgment. Because the retired judge's reasons for denying relief to Olympia were premised on his finding that the agreement conveyed a right, not an obligation, to sublease, defendants essentially sought a judgment in their favor to that effect. The district court, however, while tending to agree with the retired judge's interpretation, denied the ruling sought by defendants, HS Resources and Aspect Resources. The district court judge explained that in his interpretation of the agreement and whether it

---

[3] Olympia was joined in the motion for partial summary judgment by other parties not relevant to our discussion.

[4] The judge's reasons given from the bench refer to HS Resources as a singular defendant and respondent to Olympia's partial motion for summary judgment. However, the judge's written judgment clarifies that the motion and its denial involved both HS Resources and Aspect Resources.

afforded a right or compelled an obligation to sublease, "I won't go as far as [the retired judge] did; but it seems more sensical that the defendants' interpretation is correct. But is that so clear and unambiguous as to warrant … summary judgment? I don't see it that clear and unambiguous."

In October 2011, an *ad hoc* judge was appointed to handle this matter. Defendants sought reconsideration of their motion for partial summary judgment that had been denied. During the hearing on the reconsideration, the *ad hoc* judge invited Olympia to make a motion to reconsider the retired judge's denial of Olympia's motion. Upon Olympia's oral motion for reconsideration, the *ad hoc* judge found the agreement imposed an obligation on defendants to sublease; explaining:

> Well, my reading of it is that the use of the word "subject to exclusive option" should not be confus[ed with] … a belief that it's a pure option that we're talking about. It's not, it's a provision which imposes certain obligations on people, and it's quite clear that it was expected that HSR and Aspect would lease a minimum of 15 percent of the [El Paso] lands which were identified earlier.
> Now, that's true, they were exercising an option, but there's nothing in Louisiana law that says a party can't obligate itself to exercise a part or exercise an option a certain way. And I feel that they obligated themselves to lease the 15 percent.

The matter proceeded to trial in this posture, with the question of whether the agreement afforded a right or imposed an obligation having been answered as imposing an obligation upon HS Resources and Aspect Resources to lease at least 15 percent of the land described in the agreement. Before trial, however, HS Resources agreed to a settlement and was dismissed.

After a bench trial commenced in October 2011, the district court ruled against Aspect Resources in many respects and assessed damages of over $13 million. Having already discerned via summary judgment that Aspect Resources was obligated to sublease at least 15 percent of Olympia's mineral holdings, the district court

7

quantified Aspect Resources' breach of that obligation as meriting an award to Olympia of $1,537,500. Finding Aspect Resources breached an obligation to conduct a seismic survey of all lands described in the agreement, the district court awarded damages to Olympia of $4,525,000. The district court also reasoned that lacking a complete seismic survey, Olympia was unable to attract other sublessors in the year after the agreement with Aspect Resources expired, and the court awarded $615,000 in damages. In a similar vein, although complete seismic surveys had been performed of the southern half of Olympia's lands, the district court found Aspect Resources failed to perform its obligation to provide Olympia with the raw seismic data. Having computer-processed data, but lacking the raw seismic data, Olympia again could not attract as much interest in marketing its mineral holdings and suffered lost rentals and bonuses of $486,875 during the 2002-2005 period recognized by the district court as being compensable. Another result of not having the raw data, in the district court's view, was a loss of mineral operations that would have been conducted had Aspect Resources provided the raw data. For the lost mineral royalties from such operations, the district court awarded $7,120,140. Because of the settlement by HS Resources, the district court ruled "Aspect Resources, LLC is entitled to a fifty percent (50%) credit" on all damage awards.

The district court also dismissed with prejudice all claims by Aspect Resources in reconvention for Olympia's dissemination of the seismic survey data in alleged violation of the confidentiality requirement in the license agreement. Claims by other business entities, which were not parties to the agreement, but were purportedly damaged by Aspect Resources' conduct, were also dismissed.[5]

---

[5] The latter claims against Aspect Resources, brought by non-parties to the agreement, are not before this court.

8

<u>The Appellate Court Rulings</u>

Aspect Resources appealed the district court's judgment on all issues. Olympia answered, seeking *inter alia* an award of attorneys' fees and interest and an increase in damages for lost royalties.

The appellate court agreed with the district court "that Aspect failed to perform all three of its major obligations to Olympia … and breached the contract." **Olympia Minerals, LLC v. HS Resources, Inc.**, 13-110, p. 15 (La.App. 3 Cir. 8/21/13), 123 So.3d 281, 293. The first contractual provisions analyzed were those relating to the question of whether Aspect Resources had a right or obligation to sublease. The appellate court noted the district court's "determin[ation] that the term 'subject to exclusive option'" in the agreement "was not a 'pure option'" but "[i]nstead ... imposed an obligation on Aspect … to lease a minimum of 15% of the [El Paso] Lands," and "Louisiana law contained no provision preventing the option from being exercised in this manner." The appellate court found "no abuse of discretion" and upheld the district court's ruling. *Id.*, 13-110 at 15-16, 123 So.3d at 293-94.

The second contractual provisions analyzed were those relating to seismic surveying. Although the agreement stated at one juncture that "ASPECT shall not be obligated to include all [El Paso] Lands optioned hereunder in the final survey outline," at another juncture, the agreement stated that "ASPECT shall commence the acquisition of 3-D seismic data across the [El Paso] Lands." *Id.*, 13-110 at 16, 123 So.3d at 294 (italics omitted). The appellate court agreed with the district court that extrinsic evidence outside the contract was required to reconcile the meaning of the seemingly conflicting quoted provisions as a way of putting the agreement in its full context. The appellate court found no manifest error in the district court's reliance on

the testimony of one of El Paso's officers, who indicated that the "shall not be obligated" language was a customary way of recognizing in the exploration business that because there are certain surface areas, "such as towns, cemeteries, or tracts lacking the proper permit," and such obstacles would preclude undertaking seismic surveying of areas in the vicinity. *Id.*, 13-110 at 18, 123 So.3d at 295. Thus, the appellate court found Aspect Resources had breached its surveying obligation by only surveying the southern half of the El Paso lands, because Aspect Resources decided not to survey more than half, and Aspect Resources' decision had nothing to do with any surveying obstacles. The appellate court affirmed the award of "$4,525,000 as the cost to Olympia for its loss associated with the incomplete survey conducted by Aspect." *Id.*, 13-110 at 25, 123 So.3d at 299.

The appellate court also affirmed the district court's damage award against Aspect Resources in the amounts of $615,000, representing a loss of bonuses and rentals for the northern half of the El Paso lands, and $486,875 for a loss of bonuses and rentals for the southern half. The appellate court explained that "there was sufficient evidence in the record at the time of trial to support these claims." *Id.*, 13-110 at 24, 123 So.3d at 298.

The third contractual provisions were those relating to the type or form of data Aspect Resources was required to provide to El Paso following the seismic survey. For the lands it had surveyed, Aspect Resources provided computer-processed data, not the "raw" or "field" data. The district court agreed with Aspect Resources that, according to industry practices, the raw/field data would not be provided absent a request. However, after El Paso was acquired by Olympia, the latter sent Aspect Resources a request for the raw/field data. The district court therefore ordered

10

specific performance. The appellate court agreed Aspect Resources breached an obligation to provide the raw/field data. *Id.*, 13-110 at 20, 123 So.3d at 296.

To reiterate, the appellate court affirmed that Aspect Resources breached the agreement in three major respects. First, Aspect Resources had the obligation, not merely the right, to sublease 15 percent of El Paso's mineral interests, but Aspect Resources failed to do so. Second, Aspect Resources failed to conduct seismic surveys of the northern half of El-Paso's land. Third, for the seismic surveys it conducted, Aspect Resources failed to provide the raw/field data.

Although the contract contained a clause precluding consequential damages, the district court, citing La. C.C. arts. 1997 and 2004 (quoted *infra*), found the clause did not apply because Aspect Resources acted in bad faith. The district court had indicated that the "failure to lease the minimum acreage and failure to complete the survey … were not the result of negligence, unforeseen events, or even a lack of ability. These were conscious and calculated business decisions." The appellate court found no manifest error in this finding. *Id.*, 13-110 at 19, 123 So.3d at 295-96.

Having agreed with the district court that there was no obstacle to awarding consequential damages, the appellate court turned to specific awards challenged by Aspect Resources. The district court quantified Aspect Resources' breach of the obligation to sublease 15 percent of El Paso's mineral interests as meriting an award of $1,537,500. The appellate court affirmed, based on evidence that El Paso had approximately 41,000 acres available for lease, and taking 15 percent of that acreage and multiplying it by the $250 per acre amount described in the agreement yielded $1,537,500. *Id.*, 13-110 at 25, 123 So.3d at 299.

The appellate court similarly affirmed the district court's award of $4,525,000 as damages for Aspect Resources' failure to survey the northern half of the property. The appellate court explained that there was record evidence showing Olympia paid Wiser Oil that amount to conduct the survey and expert testimony supporting that amount. *Id.*, 13-110 at 25-26, 123 So.3d at 299.

However, the appellate court reversed the district court's award of $7,120,140 for lost royalties since the district court arrived at this figure by re-opening evidence after trial. The appellate court found the district court abused its discretion in re-opening evidence, largely because the district court *sua sponte* chose to supplement Olympia's claim for delay damages for failing to provide raw/field data with a claim for lost royalties. Further, the record shows that El Paso "was in disarray during the period from 2001-2004, the royalty deficit span the [district] court created." *Id.*, 13-110 at 31, 123 So.3d at 302. The appellate court further explained that prior to Olympia's acquisition, El Paso "was in no position to try to develop the prospect due to its serious unrelated economic problems during this same time period." *Id.* According to the appellate court, the district court compounded its error in re-opening the taking of trial evidence when it used evidence of "the production of four wells arbitrarily selected during a much later time period." *Id.*, 13-110 at 32-33, 123 So.3d at 303.

The appellate court turned to the district court's dismissal of Aspect Resources' reconventional demand. Aspect Resources had claimed that Olympia's dissemination of the seismic survey data violated the confidentiality provisions of the seismic data license agreement. The appellate court affirmed, explaining that the district court properly determined the agreement should be retroactively terminated;

the license restrictions were, therefore, not binding because those restrictions were part of the agreement that had been retroactively terminated. *Id.*, 13-110 at 36-37, 123 So.3d at 305.

From portions of the appellate court's rulings, both El Paso (now Olympia) and Aspect Resources sought review by this court. This court granted the parties' requests for discretionary review. **Olympia Minerals, LLC v. HS Resources**, 13-2637, 13-2717 (La. 2/28/14), 134 So.3d 1166.

## LAW AND ANALYSIS

In the context of mineral exploration and rights, just as in other contexts, the "[i]nterpretation of a contract is the determination of the common intent of the parties." La. C.C. art. 2045; see also **Quality Environmental Processes, Inc. v. I.P. Petroleum Co., Inc.**, 13-1582, 13-1588, 13-1703, p. 12 (La. 5/7/14), 144 So.3d 1011, 1020. "Contracts have the effect of law for the parties and may be dissolved only through the consent of the parties or on grounds provided by law." La. C.C. art. 1983.

The contract we are called on to interpret was committed to writing. "The meaning and intent of the parties to a written instrument … is ordinarily determined from the instrument's four corners, and extrinsic evidence is inadmissible either to explain or to contradict the instrument's terms." **Ortego v. State, Dept. of Transp. and Development**, 96-1322, p. 7 (La. 2/25/97), 689 So.2d 1358, 1363.

In our analysis, we first examine the text of the agreement, which totaled 62 pages with its exhibits. Because the appellate court identified and reproduced or summarized the most salient provisions of the "NORTH STARKS PROJECT

AGREEMENT," we likewise reproduce those provisions along with the appellate court's preliminary observations, as follows:

The main contract in dispute is the North Starks Project Agreement (NSPA), signed July 19, 2000, effective August 1, 2000. The purpose of the NSPA is clearly stated in the second paragraph of the document:

HSR and ASPECT desire to conduct a 3-D seismic survey (the "Survey") covering approximately 135 square miles over an area encompassing the North Starks Project Area as described in Exhibit A-1 (the "North Starks Project Area"), located in Calcasieu and Beauregard Parishes, Louisiana. [El Paso] desires to enter into this Agreement to more fully set forth their agreement regarding HSR and ASPECT's identification, exploration and development of potential hydrocarbon accumulations and the acquisition by HSR and ASPECT of rights to conduct the Survey and drill exploratory wells on [El Paso] lands included in the North Starks Project Area.

Section 1 of the NSPA, entitled "[El Paso] LANDS," contains the explanation of the area subject to the 3-D seismic survey to be conducted by HSR and Aspect and states, in pertinent part:

1.1 ... Exhibit A-1 describes the outline of the North Starks Project Area. All lands within the North Starks Project Area, as of the effective date of this Agreement, which are owned by [El Paso] as a mineral owner and/or held by [El Paso] as a lessee under oil and gas leases will be referred to in the Agreement as the "[El Paso] Lands" and are shown on the plat attached as Exhibit A-2.

*(1) Aspect's Obligation to Lease a Minimum of 15% of the [El Paso] Lands*

Sections 1.2 and 1.3 are the focus of the first dispute between the parties, the obligation of HSR and Aspect to lease a minimum of 15% of the [El Paso] Lands:

1.2 [El Paso] hereby grants to HSR and ASPECT, effective August 1, 2000, a 12-month non-exclusive geophysical permit covering all interests of [El Paso] in the [El Paso] Lands described on Exhibits A-3 and A-4, and a 12-month exclusive option to sublease covering all interests of [El Paso] in the [El Paso] Lands, described on Exhibit A-3. Consideration for the option to sublease shall be $35 per net mineral acre (the "[El Paso] Option Consideration"). The [El Paso] Option Consideration shall be paid to [El

Paso] within two (2) business days after execution of this Agreement by [El Paso]. Immediately upon execution of this Agreement, HSR and ASPECT shall record a Memorandum of the geophysical permit and option to sublease in Calcasieu and Beauregard Parishes in the form attached hereto as Exhibit B.

1.3 The exclusive option to sublease shall provide for a bonus consideration of $250 per net mineral acre to [El Paso] on which HSR and ASPECT elect to exercise their option to sublease (the "[El Paso] Bonus Consideration"), provide that the sublease will contain a 25% overriding royalty interest to [El Paso] as lessor inclusive of the royalty interest provided in the Lease, provide for a term of three (3) years, and $250 per acre rentals ("the fixed annual rental"), all in substantially the form attached to this Agreement as Exhibit C. *HSR and ASPECT shall lease a minimum of 15% of the [El Paso] Lands subject to the exclusive option, and shall work jointly with [El Paso] to prioritize the [El Paso] Lands that may be subject to prescription and actively manage the exploration program to maximize [El Paso]'s preservation of its mineral interests.* [El Paso] shall execute and deliver a sublease within thirty (30) business days *from receipt of HSR and ASPECT's written election to exercise the option to sublease.* HSR and ASPECT shall furnish the [El Paso] Bonus Consideration to [El Paso] within five (5) business days from receipt of the executed sublease.

(Emphasis added.)

At the conclusion of the original one year term of the contract, HSR and Aspect sought an additional three-month extension of the option, but [El Paso] refused to extend the option past the twelve-month option period ending July 31, 2001.

### *(2) Aspect's Obligation to Conduct a Seismic Survey of All [El Paso] Lands*

The second issue is whether HSR and Aspect had the obligation to conduct a 3-D seismic survey of all the [El Paso] Lands. The italicized portions of Section 2.1, when compared to the italicized language of Section 2.3, illustrate the tension between the two sections of the contract:

2.1 HSR and ASPECT shall commence the acquisition of 3-D seismic data across the [El Paso] Lands within six (6) months from the effective date of this Agreement, and shall conduct the Survey at the sole cost

15

and expense of HSR and ASPECT. *HSR and ASPECT shall notify [El Paso] prior to commencement of the survey of the final shoot outline, and shall furnish a copy of the pre-plot to [El Paso]. HSR and ASPECT shall not be obligated to include all [El Paso] Lands optioned hereunder in the final survey outline.*

[2.2 HSR, ASPECT and [El Paso] are parties to that certain Starks Project Agreement, dated effective January 4, 1999, as amended, that borders directly to the south of the North Starks Project Area, attached hereto as Exhibit A-1. HSR and ASPECT desire to create a "zipper" between the Starks Project 3-D data and the North Starks Project 3-D data acquired hereunder by overlapping the Starks Project shoot boundary by ½ to 1 ½ miles. In order to accomplish this purpose for the mutual benefit of HSR, ASPECT and [El Paso], [El Paso] hereby grants to HSR and ASPECT the right to conduct the Survey across any Starks Project [El Paso] Lands lying within 1.5 miles of the outline of the North Starks Project Area, HSR and ASPECT shall designate the [El Paso] Lands lying within the North Starks / Starks "zipper" in writing to [El Paso]. Upon receipt of the final pre-plot of the survey and the written request from HSR and ASPECT, [El Paso] shall execute a separate non-exclusive geophysical permit covering the [El Paso] Lands lying within the Starks Project and HSR and ASPECT shall record a Memorandum of such permit in the form attached hereto as Exhibit B.]

2.3 HSR and ASPECT shall provide to [El Paso] a copy of the 3-D seismic *data across the [El Paso] Lands*, including the [El Paso] Lands covered by the geophysical permit described in subparagraph 2.2 hereinabove, plus a one-mile "halo", free of cost to [El Paso], in 8mm SEG-Y format within 120 days from HSR and ASPECT's receipt of the final processed migrated data from the processor.

(Emphasis added.)

### *(3) Aspect's Obligation to Deliver the Field Data to [El Paso]*

The third major dispute involves the obligation of HSR and Aspect to deliver the field data from the seismic survey to [El Paso].

Section 2.3[] states in pertinent part:

[El Paso] shall execute, prior to receipt of the seismic data, and shall remain subject to the Seismic Data License Agreement attached hereto as Exhibit D. *The seismic data*

*furnished to [El Paso] shall include field and support data, final stack and migrated data over the [El Paso] Lands plus the one-mile "halo", if collected.*

(Emphasis added.)

***Import of Exhibit D to the NSPA--The Seismic Data License Agreement***

Section 2.3, coupled with the obligation of [El Paso] to execute the Seismic Data License Agreement, provides a partial basis for Aspect's reconventional demand against Olympia for several breaches of the general provisions of the NSPA and the alleged violations of the Seismic Data License Agreement by Olympia, Wiser Oil, and the WIOs.[6] This section also provides a basis for Wiser Oil and the WIOs' request for declaratory judgment with respect to the field data from Aspect, as required by this section of the NSPA, and a request for declaratory judgment cancelling all obligations to Aspect under the Seismic Data License Agreement.

. . . .

***Miscellaneous Provisions of the NSPA***

The remaining pertinent parts of NSPA are contained in Section 5, which provides the miscellaneous provisions governing the Agreement:

5.1 This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and, except as otherwise prohibited, their respective successors and assigns; and except as otherwise stated herein, *nothing contained in this Agreement, or implied herein, is intended to confer upon any other person or entity any benefits, rights or remedies. The parties agree that this Agreement may not be assigned, in whole or in part, without the express written consent of the other party, which shall not be unreasonably withheld.*

(Emphasis added.)

. . . .

The Miscellaneous section of the NSPA further provides:

_____

[6] The appellate court used the acronym WIO to mean "working interest owners." Those parties and their arguments are not germane to our review of this case.

5.2 Unless sooner terminated or longer extended by mutual agreement of the parties hereto in writing, this Agreement shall remain in force and effect for the term of the exclusive option to sublease. The Seismic Data License Agreement, executed by the parties in the form attached hereto as Exhibit D, shall remain in full force and effect until such time as it terminates by its own terms.

. . . .

Section 5.7 provides that Louisiana law applies to this litigation and was applied by the [district] court in all of its rulings.

Section 5.8 waives the right to a jury trial ....

One additional provision of the NSPA played a crucial role in the [district] court's decision:

5.9 NO PARTY SHALL BE REQUIRED TO PAY OR BE LIABLE FOR INCIDENTAL, CONSEQUENTIAL, EXEMPLARY, PUNITIVE OR INDIRECT DAMAGES (WHETHER OR NOT ARISING FROM ITS NEGLIGENCE) TO ANY OTHER PARTY.

**Olympia Minerals**, 13-110 at 9-16, 123 So.3d at 290-93.

Whether the Agreement Imposes an Obligation or Affords a Right to Sublease

As we noted from the outset, our initial focus in this case is the lower courts' ruling that there was an obligation–not a mere right-for Aspect Resources to execute a mineral sublease. The district court made that ruling not at trial, but on a pre-trial motion for summary judgment.

This court undertakes a *de novo* standard of review when evaluating lower court rulings on summary judgment motions.[7] **Greemon v. City of Bossier City**, 10-2828, 11-0039, p. 6 (La. 7/1/11), 65 So.3d 1263, 1267. Accordingly, our review is governed by the same criteria that govern the district court's consideration of whether summary

---

[7] Perhaps overlooking that the issue of whether the agreement granted a right or imposed an obligation to sublease was decided by the district court before trial on a motion for summary judgment, the appellate court erroneously applied an abuse of discretion standard of review to this centrally important issue. See **Olympia Minerals**, 13-110 at 16, 123 So.3d at 294.

judgment is appropriate. Pursuant to La. C.C.P. art. 966(B), "[a] court must grant a motion for summary judgment if the pleadings, depositions, answers to interrogatories, and admissions, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that [the] mover is entitled to judgment as a matter of law." **Jackson v. City of New Orleans**, 12-2742, p. 5 (La. 1/28/14), 144 So.3d 876, 882. "A genuine issue of material fact is one as to which reasonable persons could disagree; if reasonable persons could reach only one conclusion, there is no need for trial on that issue and summary judgment is appropriate." **Id.**, 12-2742 at 5-6, 144 So.3d at 882. "Moreover, when a contract can be construed from the four corners of the instrument without looking to extrinsic evidence, the question of contractual interpretation is answered as a matter of law and summary judgment is appropriate." **Sims v. Mulhearn Funeral Home, Inc.**, 07-0054, p. 11 (La. 5/22/07), 956 So.2d 583, 590.

There are two paragraphs of the agreement that are central to discerning whether Aspect Resources had a right–or an obligation–to sublease mineral interests. To more closely scrutinize those paragraphs, we reproduce them here:

> 1.2 [El Paso] hereby grants to HSR and ASPECT, effective August 1, 2000, a 12-month non-exclusive geophysical permit covering all interests of [El Paso] in the [El Paso] Lands described on Exhibits A-3 and A-4, and *a 12-month exclusive option to sublease* covering all interests of [El Paso] in the [El Paso] Lands, described on Exhibit A-3. Consideration for *the option to sublease* shall be $35 per net mineral acre (the "[El Paso] *Option* Consideration"). The [El Paso] *Option* Consideration shall be paid to [El Paso] within two (2) business days after execution of this Agreement by [El Paso]. Immediately upon execution of this Agreement, HSR and ASPECT shall record a Memorandum of the geophysical permit and *option* to sublease in Calcasieu and Beauregard Parishes in the form attached hereto as Exhibit B.

> 1.3 The exclusive *option* to sublease shall provide for a bonus consideration of $250 per net mineral acre to EPMI on which HSR and

19

ASPECT elect to exercise their *option* to sublease (the "[El Paso] Bonus Consideration"), provide that the sublease will contain a 25% overriding royalty interest to [El Paso] as lessor inclusive of the royalty interest provided in the Lease, provide for *a term of three (3) years*, and *$250 per acre rentals* ("the fixed annual rental"), all in substantially the form attached to this Agreement as Exhibit C. HSR and *ASPECT shall lease a minimum of 15% of the [El Paso] Lands subject to the exclusive option*, and shall work jointly with [El Paso] to prioritize the [El Paso] Lands that may be subject to prescription and actively manage the exploration program to maximize [El Paso]'s preservation of its mineral interests. [El Paso] shall execute and deliver a sublease within thirty (30) business days from receipt of HSR and ASPECT's *written election to exercise the option* to sublease. HSR and ASPECT shall furnish the [El Paso] Bonus Consideration to [El Paso] within five (5) business days from receipt of the executed sublease. [Emphasis added.]

In paragraph 1.2, the agreement describes El Paso granting "a 12-month exclusive option to sublease" and also describes a price for "the option to sublease." The word "option" is used multiple times in paragraph 1.2. To interpret the meaning of this repeatedly used word, "option," according to our civil law tradition, we begin as we must with legislative direction. Louisiana C.C. art. 2047 provides explicit direction on this point: "The words of a contract must be given their generally prevailing meaning. Words of art and technical terms must be given their technical meaning when the contract involves a technical matter."

There is a "generally prevailing meaning" of the word "option" and, again, it is legislatively provided in the Civil Code. Specifically, La. C.C. art. 1933 defines "option" as follows: "An option is a contract whereby the parties agree that the offeror is bound by his offer for a specified period of time and that the offeree may accept within that time." As so defined, an offeree has the right, not the obligation, to accept what is being offered. Here, the offeree is Aspect Resources, which under the definition just quoted had the right, not the obligation, to exercise the "option" by subleasing El Paso mineral rights.

20

However, tacitly invoking the second sentence of La. C.C. art. 2047, Olympia suggests that in the context of mineral rights, the word "option" has a technical meaning among "landmen," for whom the word "option" has a definition different from the one provided by La. C.C. art. 1933. According to Olympia, for "landmen," who ostensibly negotiated the agreement at issue, the word "option" does not in any way mean "a contract whereby the parties agree that the offeror is bound by his offer for a specified period of time and that the offeree may accept within that time." See La. C.C. art. 1933. Instead, pointing to a legal dictionary, Olympia contends "option" merely means "[t]he right or power to choose; something that may be chosen." BLACK'S LAW DICTIONARY 1121 (7th ed. 1999).

Olympia's argument continues with the proposition that under paragraph 1.2 of the agreement, Aspect Resources was given the power to choose among El Paso's lands, but under paragraph 1.3, Aspect Resources had the obligation to choose at least 15 percent of El Paso's lands. As Olympia would have it, "option" essentially means "mandatory option," which is an oxymoron. We will address paragraph 1.3 shortly. We first, however, decline Olympia's invitation to supplant the definition of "option" provided by La. C.C. art. 1933 with a more generic definition supplied by a law dictionary. "Legislation is a solemn expression of legislative will." La. C.C. art. 2. Therefore, it follows that a definition provided by legislation should not be so easily replaced with a definition culled from a dictionary, even if "landmen" customarily understand the word "option" differently, as Olympia suggests. See also La. C.C. art. 3 ("Custom may not abrogate legislation.").[8] The fact that the parties agreed to be

---

[8] Although our analysis of the agreement is confined to applying controlling law to the agreement itself, we note that, in the record, El Paso's "landman," who took the lead in negotiating the agreement, testified that an invitation to negotiate received from an Aspect Resources' competitor, the term "option" was used by the competitor. The El Paso landman further testified that El Paso instead wanted to insist upon "obligatory acreage." This testimony refutes Olympia's contention that "landmen" understood the word "option"

21

governed by Louisiana law in paragraph 5.7 of the agreement further refutes Olympia's argument that we should supplant a legislatively-provided definition of "option" with a definition provided by a dictionary of Olympia's choosing.

Certainly, as defined by La. C.C. art. 1933, there is an obligation imposed by an option. However, that obligation is not, as Olympia argues, binding on Aspect Resources. Instead, upon the granting of an option, it is the grantor of the option, here El Paso, that alone was obligated. Much commentary explains the effect of an "option" as defined by La. C.C. art. 1933. For example, as Professor Levasseur explains, Article 1933 imposes "a unilateral promise to contract …. We can analogize such a unilateral contract to a 'one-way street,' the obligation moving in one direction only." ALAIN LEVASSEUR, LOUISIANA LAW OF CONVENTIONAL OBLIGATIONS, A PRECIS, pp. 4, 26 (2009). Furthermore, as Professor Litvinoff earlier explained, the premise of an option is that it is "[a] unilateral promise to contract." Saul Litvinoff, Of the Promise of Sale and Contract to Sell, 34 La.L.Rev. 1017, 2020 (1973-1974). Professor Litvinoff then further explained an option's operative principles:

> [O]ne party *obligates himself towards another to conclude a contract on the terms set forth, upon the other party's consent to enter into the contemplated contract.* Through such an agreement, only one party is bound; the other, although he has accepted the former's obligation, has not yet consented to bind himself by any final contract, but he has the choice to do so by simply expressing his consent. In French and Anglo-American law, such an agreement is called an option. From the viewpoint of civilian contract categories it is a typical unilateral contract, as only one party is bound. [Emphasis added.]

*Id.*

---

indicated an obligation, not merely a right, to sublease mineral rights.

   The agreement at issue never employs the term "obligatory acreage." Had the parties so intended, substituting the term "obligatory acreage" for "option" in the agreement, along with related grammatical changes, might have been one way to impose an obligation to sublease. Instead, the agreement repeatedly uses "option," which has a legislatively-provided definition that in the instant agreement affords the right, but does not impose the obligation, for Aspect Resources to execute a sublease.

From the commentary just quoted, the principle contained in the first sentence is essential for discerning the meaning of paragraph 1.3 of the agreement, to which we now turn. That principle is that the grantor of the option "obligates himself towards another to conclude a contract on the terms set forth, upon the other party's consent to enter into the contemplated contract." *Id.* For a mineral lease or sublease, "as in the case of sales, [the] thing, price, and consent are essential" elements. See La. Min. Code art. 114 (La. R.S. 31:114, cmt.).[9] Another essential element for a mineral lease or sublease is that it "must have a term." See La. Min. Code art. 115(A) (La. R.S. 31:115(A)).

From paragraph 1.3 of the agreement, Olympia hitches its argument that there is an obligation (not a mere right) requiring a sublease of mineral interests to the following language: "ASPECT shall lease a minimum of 15 % of the [El Paso] Lands subject to the exclusive option." Even if one were to focus on this clause alone, Olympia's argument to impose an obligation is unpersuasive, because there again at the end of that clause appears the word Olympia has unsuccessfully attempted to redefine: "option." To interpret this one clause as Olympia proposes would require us to give meaning to the words "shall lease" while ignoring the word "option." The standards for interpreting contracts counsel against such a narrow focus upon this one clause and also require that "[e]ach provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." See La. C.C. art. 2050.

---

[9] Because the elements for a lease/sublease under the Mineral Code coincide with elements for a sale, we note that La. C.C. art. 1933 is not the only place in the Civil Code that describes the unilateral obligation of the grantor of an option. In La. C.C. art. 2620, there is yet another explanation that the grantor of an option has the obligation to deliver the subject of the option, but the grantee has a discretionary right to enter into such a contract: "An option to buy, or an option to sell, is a contract whereby a party gives to another the right to accept an offer to sell, or to buy, a thing within a stipulated time."

Recalling that a mineral sublease requires a description of the "thing" to be subleased (La. Min. Code art. 114, La. R.S. 31:114, cmt.), we find that the clause relied on by Olympia so functions. That is, in paragraph 1.3 the clause "ASPECT shall lease a minimum of 15 % of the [El Paso] Lands subject to the exclusive option" describes the thing that Aspect Resources may sublease if it chooses to sublease at all. See, e.g., **Otter Oil Co. v. Exxon Co., USA**, 834 F.2d 531, 532 (5th Cir. 1987) (In a mineral rights setting, an offeror identified the "thing" to be leased via minimum-selection language: "That option in turn contained an express requirement that if [the offeree] chose to exercise this option, [the offeree] had to lease at least 10,000 of the 42,000 acres.").

Paragraph 1.3 of the agreement also contains other language besides "option" that indicates a choice to either sublease or not sublease. That is, paragraph 1.3 refers to Aspect Resources delivering a "written election to exercise" its "exclusive option." The word "election" has a legislatively-provided meaning which indicates not an obligation, but a choice. See, e.g., La. C.C. art. 2591 (describing an "[o]ption of buyer to supplement price," in the situation "[w]hen a sale is subject to rescission for lesion the buyer may *elect* either to return the immovable to the seller, or to keep the immovable by giving to the seller a supplement equal to the difference between the price paid by the buyer and the fair market value of the immovable.") (Emphasis added.)[10]

---

[10] It is appropriate to draw a definition from La. C.C. art. 2591, which is contained within the Civil Code's Book III, Title VII, the topic of which is sale, because the Mineral Code describes the elements of a lease/sublease as coinciding with certain elements of sales. See La. Min. Code art. 114 (La. R.S. 31:114, cmt.): "[A]s in the case of sales, [the] thing, price, and consent are essential."

Because the Mineral Code directs us to the civil law principles of sale as being comparable to the principles of leasing/subleasing mineral rights, we note that long-respected commentary also supports the proposition that the party to whom an option is made is not obligated to exercise the option. Referring to the "promise of sale," Planiol indicates: "It is not yet a sale, but the sale will perhaps one day be completed by the adherence of the buyer, if he desires." 2 M. PLANIOL, TREATISE ON THE CIVIL LAW § 1401 at 789

Moreover, interpreting the clause from paragraph 1.3 on which Olympia so heavily relies in this manner, *i.e.*, as describing the "thing" that is subject to mineral sublease, avoids the problem of casting the term "shall lease" into conflict with "option." See La. C.C. art. 2050; see also La. C.C. art. 2046 ("When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent."). Furthermore, the term "option" appears not only at the end of the "shall lease" clause relied on by Olympia in paragraph 1.3, but also the term "option" appears several other times in paragraph 1.3. As previously noted, the term "option" appears multiple times in the preceding paragraph, 1.2. Therefore, interpreting the "shall lease" clause in paragraph 1.3 as describing the thing to be subleased is an interpretation that appropriately harmonizes, rather than conflicts, with the use of the term "option" in both paragraphs 1.2 and 1.3.

In paragraph 1.3, we also find other essential elements of a sublease besides a description of the thing to be subleased. Paragraph 1.3 describes the price as "$250 per acre rentals" and describes "a term of three (3) years." Thus, our interpretation that the agreement describes Aspect Resources' right, not the obligation, to sublease mineral interests draws further support from an organizational or draftsmanship standpoint. That is, paragraph 1.2 is drafted to initially describe the existence of an "option to sublease" and what Aspect Resources will pay for that option. Then, paragraph 1.3 is drafted with a description of what Aspect Resources has the right to sublease. Consistent with the requirements of La. Min. Code arts. 114 and 115, paragraph 1.3 is drafted such that it contains these elements: the thing to be subleased, which is "a minimum of 15% of the [El Paso] Lands" (the whole of the [El Paso] lands

_____

(La.St.L.Inst.Trans. 1959).

25

are described elsewhere in the agreement); the price, which is "$250 per acre rentals;" and the term, which is "three (3) years."

To briefly summarize our analysis to this point, we find that the agreement conferred upon Aspect Resources an "option" to sublease mineral interests from El Paso. An "option" is legislatively defined and imposes on the grantor, El Paso, the obligation to make the mineral interests available for sublease, but does not impose the obligation upon Aspect Resources to sublease any of those interests. However, as the agreement is further drafted, if Aspect Resources elected to exercise its option, it was then obligated to sublease a minimum of 15 percent of El Paso's interests at a cost of $250 per acre and for a term of three years.

Recalling that the question of whether Aspect Resources was obligated to sublease was decided on a pre-trial motion for summary judgment, at this juncture, the extent of our review of this case merits examination. Following our longstanding practice, we have reviewed the correctness of the summary judgment ruling *de novo*. We ruled that the lower courts erred as a matter of law in concluding that Aspect Resources was obligated to sublease mineral interests.

The finding of an obligation to sublease significantly impacted the subsequent course of this litigation, including the issues submitted for trial. On the one hand, given that such a pivotal ruling was decided erroneously might justify remanding for a new trial. On the other hand, we recall another longstanding practice taken by this court in the interests of judicial economy: "when a mistake of law, such as a consequential but erroneous ruling on the exclusion or admission of evidence, forecloses any finding of fact, and the record is otherwise complete, the appellate court should, if it can, render judgment on the record." **Foley v. Entergy Louisiana, Inc.**, 06-0983, pp. 28-29 (La. 11/29/06), 946 So.2d 144, 164, *citing* **Ragas v.**

26

**Argonaut Southwest Insurance Company**, 388 So.2d 707, 708 (La. 1980), and **Gonzales v. Xerox Corporation**, 254 La. 182, 320 So.2d 163 (1975).

With some exceptions to this rule later noted, we find that the record is sufficiently complete for this court to render judgment on the issues submitted for our consideration by the parties. Therefore, our analysis of those issues, in light of the record evidence, continues.

Damages for Breach of Obligation to Sublease

The record is clear that Aspect Resources did not sublease any mineral interests from El Paso. Because the district court determined Aspect Resources was obligated to lease at least 15 percent of El Paso's interests, the district court quantified Aspect Resources' breach of that obligation as meriting an award to Olympia of $1,537,500. However, from our *de novo* review of the agreement, we find the district court erred.

Aspect Resources, as we have found, had the right to sublease; there was no obligation to sublease imposed upon Aspect Resources under the agreement. Accordingly, we reverse the district court's damage award of $1,537,500, which was predicated on a non-existent obligation to sublease.

Additional Obligations and the Prohibition Against Consequential Damages

The agreement, on its face, prohibits the parties from recovering consequential damages. Specifically, paragraph 5.9 provides: "NO PARTY SHALL BE REQUIRED TO PAY OR BE LIABLE FOR INCIDENTAL, CONSEQUENTIAL, EXEMPLARY, PUNITIVE, OR INDIRECT DAMAGES (WHETHER OR NOT ARISING FROM ITS NEGLIGENCE) TO ANY OTHER PARTY."

Despite this provision, the district court found Aspect Resources to have breached the agreement in bad faith and awarded Olympia additional damages, citing La. C.C. art. 2004 ("Any clause is null that, in advance, excludes or limits the liability

27

of one party for intentional or gross fault that causes damage to the other party.") and La. C.C. art. 1997 ("An obligor in bad faith is liable for all the damages, foreseeable or not, that are a direct consequence of his failure to perform."). The district court cited two reasons for triggering Articles 2004 and 1997. Specifically, the district court cited "the two major breaches of the [agreement] by defendants (failure to lease the minimum acreage and failure to complete the [seismic] survey) were not the result of negligence, unforeseen events, or even a lack of ability. These were conscious and calculated business decisions." Additionally, the district court cited Aspect Resources' "failure to make the field tapes [with the unprocessed/raw data] available to the mineral owner." The appellate court affirmed the district court's ruling that bad faith defeated Aspect Resources' claim that paragraph 5.9 barred consequential damages.

We found that Aspect Resources did not breach one of the three obligations cited by the district court. There was no obligation for Aspect Resources to sublease El Paso's mineral interests. Therefore, this situation begs the question of whether the failure of Aspect Resources to disclose the unprocessed/raw survey data and the failure to survey the remaining half of the El Paso acreage can justify a finding of bad faith, sufficient to nullify the prohibition against consequential damages contained in paragraph 5.9 of the agreement.

Our review of this issue begins with another question: whether the district court's findings related to bad faith are owed deference under the manifest error standard. Under longstanding precedent, those findings are not owed such deference given the district court's significant legal error of ruling that the agreement imposed an obligation for Aspect Resources to sublease mineral interests.

28

> It is well-settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of 'manifest error' or unless it is "clearly wrong." **Rosell v. ESCO**, 549 So.2d 840, 844 (La.1989). However, where one or more trial court legal errors interdict the fact-finding process, the manifest error standard is no longer applicable, and, if the record is otherwise complete, the appellate court should make its own independent *de novo* review of the record and determine a preponderance of the evidence.

**Evans v. Lungrin**, 97-0541, 97-0577, pp. 6-7 (La. 2/6/98), 708 So.2d 731, 735.

We turn then to the record to determine whether Olympia proved by a preponderance of the evidence that the failure of Aspect Resources to survey the remaining half of the El Paso acreage and failure to provide the unprocessed/raw seismic data can justify a finding of bad faith. Apparently, this court has never stated what constitutes bad faith under La. C.C. art. 1997, so our review is guided by revision comment (b) to article 1997, which indicates that "[a]n obligor is in bad faith if he intentionally and maliciously fails to perform his obligation." Thus, according to this comment, there are both intentional and malicious components to bad faith.

As to the extent of the survey that Aspect Resources was obligated to make, though we are not bound to give discretion in our *de novo* review, we agree with the district court on one significant point. That is, as to "the amount of acreage contemplated" by the survey, "[a] simple reading of the agreement does reveal an ambiguity on this point, arising from an apparent conflict in its provisions."

The following provisions of the agreement, both contained in paragraph 2.1, conflict. One sentence provides: "ASPECT shall commence the acquisition of 3-D seismic data across the [El Paso] Lands ...." This sentence could reasonably be interpreted to mean all El Paso lands must be surveyed. However, another sentence appears to negate an obligation to survey all El Paso lands, indicating instead:

"ASPECT shall not be obligated to include all [El Paso] Lands optioned hereunder in the final survey outline."

To dispel the doubt surrounding the extent of the survey under the agreement, the Civil Code again provides guidance. "A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties." La. C.C. art. 2053.

The district court did not apply this standard, instead relying on the self-serving testimony of El Paso executives to the effect that the agreement contemplated surveying all El Paso lands. By contrast, an executive for one of the working interest owners, Wiser Oil, testified that it was customary, especially back at the time of the survey, to split a survey into two phases. The executive further testified that it would be impossible to conduct the whole survey in one year. We also note that, under the agreement, Aspect Resources was not required to begin the survey immediately. Instead, as described by paragraph 2.1, within the one-year term of the agreement, "ASPECT shall commence the acquisition of 3-D seismic data across the [El Paso] Lands within six (6) months from the effective date of this Agreement."

Notwithstanding any ambiguity in the agreement, after splitting the El Paso lands into a northern and southern half and completing a survey on the southern half, Aspect Resources conveyed assurances to El Paso that it would begin surveying the northern half. Even so, Aspect Resources never began a survey of the northern half. Aspect Resources' operational partner, HS Resources, did request a six-month extension to survey the northern half. El Paso declined the requested extension, yet El Paso did not demand that the survey be completed.

From this course of conduct, we agree that Aspect Resources undertook the obligation to survey the entirety of El Paso lands. At trial, there was testimony by an El Paso representative to the effect that the clause in paragraph 2.1 seemingly exempting Aspect Resources from this requirement ("ASPECT shall not be obligated to include all [El Paso] Lands optioned hereunder in the final survey outline"), was simply meant to exempt surface obstacles, such as towns, cemeteries, or tracts lacking the proper permit. The district court accepted this explanation.

In resolving the ambiguity inherent in the phrase "across the [El Paso] lands" and the clause "not obligat[ing] … includ[ing] all [El Paso] Lands … in the final survey outline," it is unnecessary for us to accept the explanation about the latter clause exempting surface obstacles. Instead, pursuant to La. C.C. art. 2053 and the record evidence available to us, we find "the conduct of the parties … after the formation of the contract" sufficiently informs us of the parties' common understanding that the survey would include more than the southern half. The request for an extension to survey the northern half implies an acknowledgment of the obligation to conduct such a survey.[11] The extension described the agreement's provisions for a seismic survey thus: "Among the purposes of the Agreement was to permit HSR and Aspect to shoot a 3-D seismic survey covering approximately 135 square miles and encompassing lands owned and/or leased to [El Paso]." Relatedly, the agreement itself describes: "HSR and ASPECT desire to conduct a 3-D seismic survey (the "Survey") covering approximately 135 square miles over an area

---

[11] Although we ultimately rely on the requested extension as evidencing an obligation to survey the northern and southern halves of El Paso's mineral holdings, the fact that Aspect Resources acknowledged the obligation lends support to the district court's interpretation of paragraph 2.1 of the agreement. That is, the acknowledgment of the obligation to survey both halves supports the district court's finding that the exclusionary language in paragraph 2.1 was intended to relieve Aspect Resources from surveying areas where surface obstacles made it impractical or impossible.

encompassing the North Starks Project Area … located in Calcasieu and Beuregard Parishes, Louisiana."

Having found Aspect Resources had an obligation to conduct a survey beyond the southern half of the El Paso lands, we note that it is undisputed that Aspect Resources did not undertake a survey of any of the northern half. Therefore, Aspect Resources breached its survey obligation.

Our next inquiry is to determine whether Aspect Resources' breach of the survey obligation was done "in bad faith." Consequential damages are available to Olympia only if the agreement's clause prohibiting consequential damages is vitiated by Aspect Resources' bad faith. See La. C.C. art. 1997 ("An obligor in bad faith is liable for all the damages, foreseeable or not, that are a direct consequence of his failure to perform."). Our review is guided by Article 1997, cmt. (b), which indicates that "[a]n obligor is in bad faith if he intentionally and maliciously fails to perform his obligation."

While not excusing Aspect Resources' failure to perform its survey obligation, we do not find that failure was maliciously made. The following record evidence contradicts the notion of malice. First, there is the inherent ambiguity in the agreement as to the extent of the survey. Although we ultimately found that a requested extension on behalf of Aspect Resources revealed an acknowledgment of an obligation to survey both the southern and northern El Paso lands, that acknowledgment was dated June 28, 2001, well after the agreement was executed on or about August 1, 2000. Emerging from the backdrop of ambiguity in the agreement, this belated acknowledgment does not, in our view, indicate that Aspect Resources acknowledged this obligation from the outset, such as one would expect under these circumstances as a predicate for acting with malice toward El Paso. Next, the fact that Aspect

32

Resources asked for an extension indicates a willingness to perform the survey, a willingness which runs contrary to the notion of malice. Additionally, the testimony from the Wiser Oil executive, whose company was not a party to the agreement, suggested that the six-month period described in the agreement for conducting the survey was an insufficient amount of time given the extensive acreage to be surveyed. Finally, we note that El Paso later entered into a sublease agreement with Aspect Resources and El Paso's choice to enter into such a significant business relationship undercuts the notion that El Paso considered Aspect Resources to have acted maliciously in the parties' prior dealings. Viewed either individually or collectively, these facets of this case preclude us, in our *de novo* review, from finding that Aspect Resources acted with malice regarding the extent of its seismic survey obligation.

We turn next to the final obligation found by the district court as vitiating the agreement's prohibition of consequential damages. Specifically, the district court found Aspect Resources was obligated to provide to El Paso the "raw" or "field" data from the seismic survey, to the extent Aspect Resources had conducted the survey.

There is no ambiguity in the agreement regarding this obligation. Initially, as presented at trial, Aspect Resources did not provide the seismic data because it never received a request; such a request is standard in the industry. However, eventually Aspect Resources received a request for the data but refused to disclose it. In defense of not providing the data, Aspect Resources further claimed that it learned from a mineral unitization process that Olympia (now the successor to El Paso) had been sharing the processed data Aspect Resources had provided with other exploration companies. The data, Aspect Resources further posited, belonged to Aspect Resources, and Olympia merely held a license to use the data, but Olympia was bound not to share the data under their seismic data license agreement.

33

It is unnecessary for us to decide whether the district court erred in rejecting Aspect Resources' defense to providing the seismic data. We can reach the immediate issue of whether Aspect Resources acted in bad faith by assuming, without presently deciding, that the claims just recited did not excuse Aspect Resources from providing the data. As in our earlier analysis, we examine the record for evidence of malice. See La. C.C. art. 1997, cmt. (b).

In our *de novo* review, we find Olympia failed to prove malice in Aspect Resources' failure to provide the seismic data. Indeed, as recently as August 2011, Olympia took the position that, because the license agreement was unsigned, there was no enforceable license agreement or confidentiality owed regarding the seismic data. The district court rejected this position, with good reason, finding that "the absence of signatures did not vitiate the license." The license agreement, we further find, was part of the NORTH STARKS PROJECT AGREEMENT and was enforceable as such. Accordingly, Olympia was bound by the license's confidentiality requirement, but was nevertheless sharing seismic data with others. The record reflects that Olympia even made available to other entities computer equipment to review the seismic data and had a room with equipment devoted to sharing the data in this manner. Under such circumstances, we cannot say that Aspect Resources acted with malice in refusing to turn over more seismic data, when it was readily apparent that Olympia would not keep confidential data that, according to the agreement, belonged to Aspect Resources.

To recap, the district court cited three reasons to find Aspect Resources in bad faith and, thereby, nullified the agreement's prohibition against consequential damages. The first reason was the district court's finding that Aspect Resources breached an obligation to sublease mineral rights. However, as we have found, the agreement

merely provided Aspect Resources the right to sublease and did not impose an obligation to do so. Because Aspect Resources did not breach a non-existent obligation, there is no bad faith associated with Aspect Resources' declining to exercise the right to sublease. The second reason cited for Aspect Resources having acted in bad faith was its failure to survey the entire land for which El Paso held mineral rights. Although we found Aspect Resources breached an obligation to survey more than the southern half of those lands, we also found several factors precluding a finding of bad faith in that breach: ambiguity in the agreement; a questionable ability to complete the entire survey within a short available time frame; and, Aspect Resources' request for an extension of time to complete the seismic survey. The final instance of bad faith cited by the district court was Aspect Resources' failure to deliver raw/field seismic data. For reasons relating to the ongoing viability of reconventional demands by Aspect Resources to be discussed later in this opinion, we have assumed–without finding–that Aspect Resources breached an obligation to provide such data. Yet, even assuming a breach, the record does not support a finding of bad faith. El Paso had agreed to be bound by a license agreement,[12] which required that the seismic data provided by Aspect Resources could not be shared with other entities. Even so, the record reflects such sharing occurred. From this record, we found it was not malice that preponderates as a reason for not providing raw/field seismic data.

Permissible Damages

Because we have found that Aspect Resources did not act in bad faith, La. C.C. art. 1997 presents no impediment to enforcing the agreement's prohibition against

---

[12] It is unnecessary for us to reach Aspect Resources' argument that the lower courts erred in declaring the license agreement unenforceable because the lower courts found the contract was judicially terminated.

consequential damages. Like other salient provisions of the contract, we will analyze the enforceability of that prohibition, which we reproduce here for ease of reference: "5.9 NO PARTY SHALL BE REQUIRED TO PAY OR BE LIABLE FOR INCIDENTAL, CONSEQUENTIAL, EXEMPLARY, PUNITIVE OR INDIRECT DAMAGES (WHETHER OR NOT ARISING FROM ITS NEGLIGENCE) TO ANY OTHER PARTY."

Before addressing enforceability, however, we note that Aspect Resources in its brief contends that all damages awarded by the district court for any amount not specifically described in the contract are consequential damages, are thus barred by the agreement's prohibition against consequential damages and must therefore be reversed. Aspect Resources mainly focuses on the $4,525,000 awarded for the incomplete survey. In contrast to the option to lease (which has a price stated in the agreement), according to Aspect Resources, the award for the incomplete survey is a consequential damage valued at an amount never described within the agreement and is, therefore, barred by the agreement's prohibition against consequential damages.

Aspect Resources greatly overstates the reach of the agreement's prohibition against consequential damages. It is well-recognized that by stipulation within the contract, the "parties are at liberty to exclude some obligations from the cluster arising from their contract," but even by stipulation "the parties are not at liberty to exclude the pertinent obligation because the exclusion would negate the contract." 6 SAUL LITINOFF, LOUISIANA CIVIL LAW TREATISE: THE LAW OF OBLIGATIONS § 11.8, (pp. 316-17, 1999). Nothing in the wording of the contract's prohibition purports to render direct damages for breach of contract unavailable. The prohibition, on its face, applies to "consequential" damages. Although this term is not defined in the agreement, it is commonly understood to prohibit damages characterized by their

36

"unforeseeability or remoteness" to a breach and is synonymous with the term "special damages." 6 LOUISIANA CIVIL LAW TREATISE: THE LAW OF OBLIGATIONS § 5.17, p. 127 (describing the term "consequential" as employed in the common law); see *id.* § 5.18 at p. 130 (noting "[t]he common-law distinction between general and special damages has been received by the Louisiana jurisprudence.").

Having determined the wording relied on by Aspect Resources does not exclude damages foreseeable from a breach of contract, we next examine what damages are available here. In discerning what damages are directly available for breach, we again begin with the principles set forth in the Civil Code and apply those principles to the breach we have found of the obligation to survey more than the southern half of the El Paso lands.

For breach of contract, specific performance is the preferred remedy. See La. C.C. art. 1986. However, where, as here, "[i]f specific performance is impractical, the court may allow damages to the obligee." *Id.*[13] "Damages are measured by the loss sustained by the obligee and the profit of which he has been deprived." La. C.C. art. 1995. "An obligor in good faith is liable only for the damages that were foreseeable at the time the contract was made." La. C.C. art. 1996.

Although a monetary value for the survey is not described in the agreement, by the terms of the agreement, conducting the survey is nevertheless one of the performances owed by Aspect Resources to El Paso in exchange for performances rendered by El Paso. Practically speaking, this type of arrangement is quite common.[14] The Civil Code describes this arrangement in these terms: "A contract is

---

[13] The impracticality of ordering Aspect Resources to conduct the survey of the northern El Paso lands lies in the fact that Olympia has already obtained a survey from another source.

[14] Because the obligation to conduct a survey is described in the agreement, we reject the lower courts' description of the damages for failure to complete the survey as "consequential damages." See **Olympia**

bilateral, or synallagmatic, when the parties obligate themselves reciprocally, so that the obligation of each party is correlative to the obligation of the other." La. C.C. art. 1908.

Contrary to Aspect Resources' argument that the survey was not a benefit of any bargain, we find the option previously discussed, whereby El Paso owed the obligation to make available its lands to Aspect Resources for the latter's right to sublease mineral rights, is one obligation imposed on El Paso correlative to Aspect Resources undertaking correlative obligations described in the agreement. Under paragraph 1.2, Aspect Resources had the correlative obligation to pay "$35 per net mineral acre," and under paragraphs 2.1, 2.2, and 2.3, Aspect Resources had an additional correlative obligation of undertaking a seismic survey of the El Paso lands.

Stated differently, a survey including the northern El Paso lands was one of the benefits El Paso was to receive of the bargain struck between El Paso and Aspect Resources. The agreement had a term of twelve months, during which time Aspect Resources was permitted to conduct the operations necessary for the seismic survey. Although Aspect Resources is correct that El Paso would only have a license for use of the seismic survey data and not have full ownership, the terms of the agreement nevertheless establish that the seismic survey was a significant benefit to El Paso from the agreement. For instance, pursuant to paragraph 2.3 of the agreement, after providing the processed data, Aspect Resources was obligated to provide all seismic data to El Paso "free of cost." Pursuant to the seismic data license itself, El Paso had rights to the seismic data for 49 years, a considerable length of time, during which time it could use the data for its own purposes. Under the license, El Paso also was

---

**Minerals**, 13-110 at 25, 123 So.3d at 299. As discussed further in this opinion, damages are recoverable because the survey was one of the performances specifically required in the contract.

allowed to use the data to make presentations to third parties "to explore, develop[,] produce, or finance any appropriate property for the purposes of identifying subsurface oil and gas deposits," subject to the condition that "no copies of the Data are furnished to such third party and that such third party agrees to treat all such Data as confidential."

Aspect Resources argues that El Paso's duty to mitigate damages precludes awarding the cost of the survey. The duty to mitigate is described in La. C.C. art. 2002 and requires that an aggrieved "obligee ... make reasonable efforts to mitigate the damage caused by an obligor's failure to perform." When the duty to mitigate exists but is unmet, "the obligor may demand that the damages be accordingly reduced." *Id.* According to Aspect Resources, the district court awarded the costs of the survey in a misguided attempt to mitigate lost royalties El Paso suffered in the wake of breaches by Aspect Resources. However, because we have ruled the survey was itself one of the benefits El Paso was to receive under the contract, we reject the argument that the duty to mitigate precludes a damage award for the costs of the survey, notwithstanding whether there existed any connection to lost royalties.

As to the measure of damages for the survey, the district court accepted the testimony of "George Hite, a petroleum engineer and an expert in the evaluation of oil and gas interests," whose calculations were used to arrive at a damage award representing the cost to complete the survey of $4,525,000. See **Olympia Minerals**, 13-110 at 25, 123 So.3d at 299. As we noted earlier, under La. C.C. art. 1995, one component of damages is the "loss sustained by the obligee." Contrary to the argument of Aspect Resources, it is of no moment that no monetary value for the survey is described in the agreement. Under La. C.C. art. 1999, "[w]hen damages are

39

insusceptible of precise measurement, much discretion shall be left to the court for the reasonable assessment of these damages." See **Youn v. Maritime Overseas Corp.**, 623 So.2d 1257, 1261 (La. 1993) (noting "the discretion vested in the trier of fact is 'great,' and even vast, so that an appellate court should rarely disturb an award of general damages."); 6 LOUISIANA CIVIL LAW TREATISE: THE LAW OF OBLIGATIONS § 8.9 at p. 244 ("Although … judicial discretion for the assessment of damages and appellate review of the exercise of that discretion have been more extensively treated by the Louisiana jurisprudence in connection with quasi-delictual damages, … the standard for that review is not different where damages for breach of contract are concerned.").

We similarly reject the argument of Aspect Resources that the award for the incomplete survey should be reversed because El Paso suffered no loss by not having the complete survey. We reject this argument not only because we have found the survey was specifically described as one of the benefits of the bargain, but also because, as part of that very same bargain, El Paso, in an effort to obtain a full survey, kept its mineral interests covering approximately 42,000 acres out of commerce for one year pursuant to the agreement's "exclusive option" in favor of Aspect Resources. Because the amount of the district court's award for the cost of completing the survey is supported by competent testimony, we find no abuse of discretion in the award to Olympia of $4,525,000; however, the parties acknowledged at oral argument that the written judgment contained a typographical error, thus, we amend the judgment to reflect the amount of the award is $4,125,000.[15]

---

[15] Describing available procedures in appellate courts, La. C.C.P. art. 2164 indicates, in pertinent part: "The appellate court shall render any judgment which is just, legal, and proper upon the record on appeal."

As earlier noted, in its brief, Aspect Resources takes a very broad view of what monetary damages are precluded by the waiver of consequential damages. More specifically, Aspect Resources now argues "reinstating the waiver [of consequential damages] requires reversal of all damages." However, in its request for this court's discretionary review, Aspect Resources did not challenge every item of monetary damages. To this point in this opinion, we have reviewed the monetary damages presented to this court in Aspect Resources' writ application.[16] We decline the invitation to address damages that were not presented in the writ application. See **Sensebe v. Canal Indem. Co.**, 10-0703, p. 17 (La. 1/28/11), 58 So.3d 441, 451, *citing* **Agilus Health (Taylor) v. Accor Lodging North America**, 10-0800, p. 11 n.4 (La. 11/30/10), 52 So.3d 68, 76 n.4. Thus, we leave undisturbed and affirm the award "[f]or the 2001-2002 lost bonuses and rentals, $615,000," and the award "[f]or the 2002-2005 lost bonuses and rentals, $486,875[.]" Also unchallenged was the district court's ruling that "[b]y virtue of a prior settlement of codefendants HS Resources, Inc. and Kerr-McGee Oil & Gas Onshore, LP, Aspect Resources, LLC is entitled to a fifty percent (50%) credit on the foregoing amounts and interest." We therefore affirm the credit of 50 percent on all affirmed awards.

Reconventional Demands

Aspect Resources has sought review of the district court's dismissal of reconventional demands brought against El Paso, now Olympia, and against the

---

[16] Indeed, we were informed in the writ application that the only damages for "lost bonuses and rentals" being challenged were those connected with Aspect Resources' failure to complete the seismic survey of the northern half. Specifically, Aspect Resources focused on the $4,525,000 award, asking in its writ application that we "reverse[] and replace[]" that amount "with $230,625, which constitutes Olympia's maximum loss due to its delayed receipt of the phase two data." Yet, having ruled here that the $4,525,000 award, as amended, was proper, we need not address the original argument that such award should be replaced with a lesser amount, or the newly presented argument that all damages must fall along with the $4,525,000 award.

41

working interest owners, not parties to the contract but seeking damages against Aspect Resources under a theory of being third party beneficiaries. Aspect Resources' reconventional demands are premised on the alleged misappropriation of seismic data contrary to the terms of the license agreement and in violation of the Louisiana Uniform Trade Secrets Act and/or the Louisiana Unfair Trade Practices Act. The district court explained that it had declared the contract judicially dissolved due to Aspect Resources' breach, therefore "Olympia cannot breach a dissolved contract."

The court of appeal agreed, effectively pretermitting review of the merits of Aspect Resources' arguments. However, we have found legal error in the lower courts' rulings that there was an obligation, not an option to sublease. Both lower courts relied on that ruling in finding that judicially dissolving the agreement was proper and that El Paso/Olympia could not, therefore, have violated the seismic data license agreement. Because we have reversed that "obligation" ruling, we remand this matter to the court of appeal for a re-evaluation of the reconventional demands. See, e.g., **Snider v. Louisiana Medical Mut. Ins. Co.**, 13-0579, p. 22 (La. 12/10/13), 130 So.3d 922, 939 (After finding the court of appeal applied an incorrect standard of review, we "remand[ed] this matter to the appellate court with instructions to consider and rule upon plaintiffs' assignments of error, including those assignments of error pretermitted by the appellate court, in accordance with the views expressed herein."). Accordingly, the court of appeal is directed to review the correctness of the dismissal of the reconventional demands and, as that court then deems necessary and appropriate, the court may reach the merits of the reconventional demands, consistent

with the rulings in this opinion, or else remand to the district court if additional evidence is required.[17]

Attorneys' Fees

Olympia argues that the lower courts erred in not awarding the attorneys' fees it incurred in defense of the allegations Olympia violated the seismic data license and violated Louisiana's Uniform Trade Secrets Act (La. R.S. 51:1431, *et seq*.) and Unfair Trade Practices Act (La. R.S. 51:1401, *et seq*.). The court of appeal ruled that Olympia failed to properly raise the issue in the district court. Concluding, then, that Olympia raised the issue for the first time on appeal, the appellate court declined to consider the merits of the issue. We find no error in this conclusion.

Olympia points to a demand for attorneys' fees in one of its own amended petitions to refute the contention that it did not seek attorneys' fees in the district court. However, Olympia acknowledges that it did not include a request for attorneys' fees in its answer submitted in response to Aspect Resources' reconventional demand. Seeking attorneys' fees in its own petition, rather than in answer to the reconventional demand, is insufficient to raise the issue that Olympia sought attorneys' fees for defending against the reconventional demand. See La. C.C.P. art. 1003 (requiring an answer to "contain a prayer for the relief sought").[18] Therefore, because Olympia was barred on direct appeal from obtaining relief in the form of attorneys' fees, regardless of the court of appeal's determination on remand as to the viability or merits of Aspect

_____

[17] Parenthetically, we note that litigants who were not party to the agreement are also potentially liable as targets of Aspect Resources' reconventional demands. Those litigants have been put on notice of this court's granting of discretionary review, but none of those litigants has filed a brief in opposition to Aspect Resources' request for reinstatement of the reconventional demands.

[18] Even pre-dating the Code of Civil Procedure, the jurisprudence recognized that "the nature of the relief sought by the defendant is determined by the prayer of the answer." **Rainey v. McCrocklin**, 185 So. 705, 706 (La. Ct.App. 1939), *citing* **Rudd v. Land Co.**, 188 La. 490, 177 So. 583, 585 (1937).

Resources' reconventional demands, Olympia remains barred from recovering attorneys' fees.

## CONCLUSION

The lower courts legally erred in ruling that beyond a mere right to sublease mineral interests, there was an actual contractual obligation for Aspect Resources to sublease. As the parties' agreement is constructed, we find that under the legislatively provided definition of the term "option," the agreement imposed the obligation on El Paso to make available its mineral holdings to Aspect Resources. The agreement further provided that if Aspect Resources provided a "written election to exercise the option to sublease," then Aspect Resources was bound to sublease at least 15 percent of the available mineral interests. However, Aspect Resources did not elect to exercise the option, a choice it was entitled by the agreement to make. We reverse, therefore, the district court's damage award of $1,537,500, which was predicated upon a non-existent obligation to sublease.

We also find the lower courts erred in concluding that Aspect Resources breached the agreement in bad faith. The lower courts justified a finding of bad faith in large measure on Aspect Resources breaching an obligation to sublease. Such an obligation, we have ruled, was non-existent as a matter of law. The remaining justifications for finding Aspect Resources to have acted in bad faith do not survive *de novo* review of the record. Accordingly, and contrary to the lower courts' holdings, the agreement's prohibition against consequential damages is enforceable.

The agreement's prohibition against consequential damages is not, however, the all-encompassing shield from every amount of damages imposed by the lower courts, as Aspect Resources urges. Under the agreement, Aspect Resources undertook an obligation to conduct a seismic survey of El Paso's mineral interests, but Aspect

44

Resources only conducted the survey on the southern half of El Paso's holdings. Because a complete survey was one of the benefits of a bargain, under which El Paso agreed to keep its mineral interests off the market for a year, damages for failure to conduct the survey cannot fairly be characterized as consequential. The $4,525,000 in damages awarded by the district court for the failure to conduct a complete seismic survey is consistent with the foreseeable results of Aspect Resources' failure to complete the survey. Thus, this award was proper; however, because the parties have acknowledged that the written judgment contained a typographical error, we amend the judgment to reflect the amount of the award is $4,125,000.

We also leave undisturbed and affirm the award "[f]or the 2001-2002 lost bonuses and rentals, $615,000," and the award "[f]or the 2002-2005 lost bonuses and rentals, $486,875[.]" These amounts were not challenged in the application for our supervisory review; we thus decline to reach the merits of these awards and the related question of whether they survive the prohibition against consequential damages. Similarly unchallenged was the district court's granting of a 50 percent credit for all damage awards due to a co-defendant's settlement. We, therefore, affirm this percentage credit to Aspect Resources for all damage awards.

Aspect Resources brought reconventional demands against Olympia (formerly El Paso), alleging that because the agreement maintained ownership of seismic data with Aspect Resources, El Paso/Olympia and others not party to the agreement are liable for exceeding the permissible use of that data under a license incorporated into the larger agreement. The district court ruled that because of Aspect Resources' failure to fulfill the terms of the agreement, the agreement was judicially dissolved and there was no license restriction imposed on El Paso/Olympia and the others who allegedly used the data. The court of appeal affirmed for the same reasons. Central

45

to the reasoning of both lower courts was their ruling that Aspect Resources had breached an obligation to sublease mineral interests. However, we have found that Aspect Resources was not required by the agreement to sublease. Therefore, because the court of appeal, when adopting the reasoning of the district court essentially pretermitted reaching the merits of Aspect Resources' arguments, we remand this matter to the court of appeal to review the correctness of the dismissal of the reconventional demands, and as that court then deems necessary and appropriate, the court may reach the merits of the reconventional demands, consistent with the rulings in this opinion.

We agree with the court of appeal, however, in pretermitting consideration of the merits of Olympia's claims for attorneys' fees. We find no error in the conclusion that Olympia did not properly raise this issue in the district court; and, like the court of appeal, we decline to reach this issue in the first instance in this court.

**AFFIRMED IN PART; REVERSED IN PART; AMENDED IN PART; AND REMANDED TO THE COURT OF APPEAL.**