# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE

NEWS RELEASE #004

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **6th day of February, 2025** are as follows:

**BY Crain, J.:**

2024-C-00627    HUNTSMAN INTERNATIONAL, L.L.C. AND RUBICON, L.L.C.   VS. PRAXAIR, INC. (Parish of Orleans Civil)

AMENDED IN PART. SEE OPINION.

Hughes, J., dissents for the reasons assigned by Knoll, J.
Knoll, J., dissents and assigns reasons.
Griffin, J., dissents for the reasons assigned by Knoll, J.

# SUPREME COURT OF LOUISIANA

# No. 2024-C-00627

## HUNTSMAN INTERNATIONAL, L.L.C. AND RUBICON, L.L.C.

## VS.

## PRAXAIR, INC.

On Writ of Certiorari to the Court of Appeal, Fourth Circuit,
Parish of Orleans Civil

**CRAIN, J.** [*]

In this breach of contract claim, we find the jury abused its discretion by awarding lost profits not established with reasonable certainty by the evidence. We amend the award.

## FACTS AND PROCEDURAL HISTORY

Huntsman International, LLC is a publicly traded company in the chemical business. Its largest division produces chemical compounds used to make polyurethane, a versatile material in a vast array of products across multiple industries, including consumer goods, automotive, and construction. One of the ingredients of polyurethane is methylene diphenyl diisocyanate (MDI), a chemical compound that is the focus of Huntsman's polyurethane division. Huntsman produces MDI at overseas facilities in China and the Netherlands, but its highest producing plant is in Geismar, Louisiana, where about three million pounds of MDI are produced each day and a billion pounds each year.

---

[*] Justice Jeanette Theriot Knoll, retired, appointed Justice Pro Tempore, sitting due to the vacancy in Louisiana Supreme Court District 3.

[*] Chief Judge John Michael Guidry, was appointed Justice ad hoc, sitting for Justice Scott J. Crichton for oral argument. He sits as an elected Justice at the time this opinion is rendered.

While the product is often singularly referred to as MDI, the Geismar plant actually produces hundreds of variations or "flavors" of MDI specifically tailored to the type of polyurethane to be manufactured with the compound. Because different types of MDI are required to make different polyurethane products, each variation of MDI is a distinct product. Huntsman sells variations of MDI products to hundreds of customers. Most have long term contracts with Huntsman, but about one-third of the company's business is on-demand or "spot" customers. These customers buy MDI products as needed without long term contracts.

To produce MDI products, the Geismar plant requires a constant source of industrial gases, namely hydrogen and carbon monoxide. For several years, these gases were provided by the defendant, Praxair, Inc., whose facility is located immediately adjacent to Huntsman's Geismar plant. Through pipelines connecting their respective facilities, Praxair provided hydrogen and carbon monoxide to Huntsman pursuant to several gas supply contracts between the parties.

In 2014, Huntsman sued Praxair alleging it breached the supply contracts on numerous occasions over an approximate nine-year period from September 16, 2004, through December 31, 2013. During that time, according to Huntsman, it lost sales of MDI products because Praxair failed to supply the Geismar plant with sufficient hydrogen and carbon monoxide to maintain the plant's production schedule. In addition to lost profits for MDI sales, Huntsman sought recovery of lost profits for sales of another compound, aniline, produced at the Geismar plant as a component of MDI and sold as a separate product. Huntsman also pursued "cover damages," the additional cost the company incurred to purchase industrial gas from another supplier to maintain production required by Huntsman's contract customers.

The claims proceeded to a three-week jury trial where numerous witnesses testified and over 200 exhibits were introduced. Because the issue before this court

2

is limited to damages, specifically lost profits, we focus our review on the evidence relevant to that claim.

The only witness to quantify Huntsman's lost profits was Rebecca Szelc, an expert in economic damages called by plaintiff. Szelc has a master's degree in business administration, thirty years of experience developing lost-profits claims, and was described by Huntsman's counsel to the jury as "one of the world's best experts in calculating these things."

Szelc used a basic formula for calculating lost profits: (1) lost sales, measured in pounds of product, multiplied by (2) a profit margin per pound. The profit margin, which Szelc sometimes referred to as the "contribution margin," is the net profit per pound earned by Huntsman on the sale of a product. While Szelc's lost-profit formula is fairly straight forward, determining the figures for the two variables proved more complicated. The breaches usually lasted only a few days and occurred at numerous intervals for almost a decade. During that time, the market for MDI products fluctuated in response to general economic conditions, demand for particular products, the cost of raw materials, and other market factors. In any given month, Huntsman sold different products to different customers at different prices and profit margins.

To further complicate the matter, Huntsman had no records of the alleged lost sales. Aside from a few emails, Huntsman did not document sales that were canceled or otherwise lost because of diminished production from gas shortages. This lack of documentation, according to Huntsman's executives, is because the lost sales were all spot sales, which are opportunistic and not easily identified or tracked when lost. With no records of lost sales, Szelc had to develop a method for determining the amount and type of products that likely would have been sold when each breach occurred and, just as importantly, an accurate profit margin for those sales.

Szelc toured the plant, spoke to Huntsman personnel, and studied volumes of sales and production information provided by Huntsman. The Geismar plant basically sold all of its production, so Szelc surmised the amount of lost sales during each breach could be determined by identifying the amount of lost production caused by the breach. In short, lost production equaled lost sales.

The Geismar plant maintained detailed, daily production records for its MDI and aniline units. Technicians prepared downtime reports documenting each unit's total production for each day, any reduction in production or downtime, and the reasons for the reduction or downtime. Huntsman consolidated all of the daily downtime reports in a spreadsheet provided to Szelc. Using this information, Szelc determined the lost production on a month-by-month basis, pinpointing the dates of each breach, the duration of the breach, and the resulting amount of production lost due to a breach. Szelc made this determination for each month a breach occurred. Adding the monthly totals, Szelc determined Huntsman cumulatively lost production, and thus sales, of 97,675,260 pounds of MDI products and 29,741,887 pounds of aniline due to Praxair's breaches.

While the production records identified the volume of lost sales, the records did not identify which products would have been sold and at what profit margin, essential information for determining the lost profits. With no records of specific lost sales, Szelc had to determine the likely products and profit margins for prospective sales that were lost at various points over a nine-year period. As explained by Szelc:

> [W]e don't know exactly what products they didn't produce or sell at that period of time. We don't know every flavor and the quantity of every flavor that was [not] sold.

* * *

4

[O]bviously your product mix is going to change every month and the prices that you sell it for may change as well because it's going to reflect market conditions, the cost of your inputs, that sort of thing.

To assist Szelc, Huntsman again compiled detailed spreadsheets that identified every sale of an MDI or aniline product, including the profit margin and sales volume, for each month during the nine-year period at issue. Focusing on the months when a breach occurred, Szelc used the spreadsheets to develop a "product mix" for each affected month that consisted of the products actually sold during the month. Szelc then calculated an average profit margin for those sales that was weighted based on the sales volume for each component product. Like her approach to lost production, Szelc made individual determinations for each month where a breach occurred. The average profit margins varied from month to month, but the cumulative average for the entire nine-year period was $0.36 per pound for all MDI products and $0.08 per pound for aniline.

Szelc inserted the monthly figures for lost sales and profit margin into her formula and determined Huntsman's lost profits for each affected month. She then added the monthly losses to arrive at total lost profits of $37,522,291 caused by Praxair's breaches. This sum includes $35,142,940 in lost profits for MDI products and $2,379,351 in lost profits for aniline.

Szelc described her figures as "conservative" because her monthly product mixes include all sales, both spot and contract, for each affected month. The lost sales were all spot sales, which have slightly higher average profit margins. By including contract sales in her calculations, Szelc acknowledged her figures "underrepresent" the lost profits and are "closer to the floor than the ceiling." Still, Szelc confirmed her method was "the best or the fairest representation of what that contribution margin would have been" because it used "the mix of flavors that you sold in that month at the volumes you sold them in that month." Szelc did not change

5

her opinions, and no other witness quantified Huntsman's lost profits or suggested another method for determining profit margins for the lost sales.

In closing arguments, Huntsman's counsel emphasized Szelc's profit margins were too low because they included contract sales. Counsel suggested "a couple of other ways to calculate" the profit margins using the spreadsheets documenting sales, exhibits 1025 and 1048. The first alternative, according to counsel, is to average the profit margins for the "top third" most profitable transactions in the spreadsheets ("the top-third method"), which he told the jury results in lost profits of $88,117,405. Counsel argued this approach produces an accurate profit margin because spot sales were the "top third of [Huntsman's] business." The second proposed alternative is to average the profit margin for the "top 100" most profitable transactions, which results in lost profits, according to counsel, of $186,423,603.

The jury was given printed versions of exhibits 1025 and 1048, which exceed 1,000 pages and have over 76,000 lines of data in a dozen columns. The information includes all MDI and aniline sales over the subject nine-year period, organized by product type and individual sales, plus the sale date, volume, profit margin, and product codes among other information. After beginning deliberations, the jury submitted several written questions to the trial court about the spreadsheets, including:

> What are the headers for 1025 and 1048 and what do they mean[?]
> What is each subject line of 1048[?]
> What does 1025 represent? What sales?
> What does summary of 1048 represent?

After conferring with counsel for both parties, the trial court instructed the jury to rely on their notes and recollections of the evidence to render a decision.

The jury returned a verdict in favor of Huntsman awarding lost profits of $88,117,405, the figure produced by the top-third method suggested by Huntsman's counsel. The jury also awarded cover damages of $4,991,473. The trial court signed

6

a judgment in accordance with the jury's verdict and later denied Praxair's motion for new trial. The court of appeal affirmed, with two judges dissenting in part on the award of lost profits. *Huntsman International, L.L.C. v. Praxair, Inc.*, 22-0777 (La. App. 4 Cir. 4/19/24), ___ So. 3d ___ (2024WL1695071). This court granted Praxair's writ application. *Huntsman International, L.L.C. v. Praxair, Inc.*, 24-0627 (La. 10/1/24), 393 So. 3d 315.

## DISCUSSION

In a breach of contract claim, plaintiff bears the burden of proving defendant owed plaintiff an obligation, defendant failed to perform the obligation, and defendant's failure resulted in damages to the plaintiff. *Hayes Fund for First United Methodist Church of Welsh, LLC v. Kerr-McGee Rocky Mountain, LLC*, 14-2592 (La. 12/8/15), 193 So. 3d 1110, 1115. The only issue before this court is the amount of the award for lost profits. Praxair contends the award is not supported by the evidence, requires expert testimony to substantiate, and is the product of a methodology not disclosed during discovery. Finding merit in the first contention, we pretermit consideration of Praxair's remaining arguments.

An obligor is liable for the damages caused by his failure to perform a conventional obligation. La. Civ. Code art. 1994. Damages are measured by the loss sustained by the obligee and the profit of which he has been deprived. La. Civ. Code art. 1995. When damages are insusceptible of precise measurement, much discretion shall be left to the court for the reasonable assessment of these damages. La. Civ. Code art. 1999.

While Article 1999 vests the fact-finder with much discretion in determining damages, lost profits must be proved with reasonable certainty and cannot be based on speculation or conjecture. *See Cox, Cox, Filo, Camel & Wilson, LLC v. Louisiana Workers' Compensation Corporation*, 21-0566 (La. 3/25/22), 338 So. 3d 1148,

7

1157; *George W. Garig Transfer v. Harris*, 226 La. 117, 130; 75 So. 2d 28 (1954). The proof must contain "a degree of detail and specificity sufficient to extricate [the lost] profit from the realm of conjecture." Litvinoff and Scalise, 6 La. Civ. L. Treatise, *Law of Obligations* § 4.9 (2d ed.). The fact-finder abuses its discretion by awarding lost profits not reasonably supported by the evidence or justifiable inferences drawn therefrom. *See Olympia Minerals, LLC v. HS Res., Inc.*, 13-2637 (La. 10/15/14), 171 So. 3d 878, 902-03; *Walker v. Creech*, 509 So. 2d 168, 172 (La. App. 1 Cir. 1987), *writ denied,* 512 So. 2d 464 (La.1987); *Law of Obligations*, 6 La. Civ. L. Treatise at § 8.9.

Huntsman maintains the jury's lost-profits award of $88,117,405, despite being twice the amount calculated by its expert, is reasonably supported by the evidence. To arrive at its verdict, the jury used Szelc's basic formula but determined the profit margin using counsel's suggested top-third method: the average profit margin of the top-third most profitable transactions in joint exhibits 1025 and 1048. Huntsman argues this method is supported by evidence establishing the lost sales were all spot sales, which are one-third of Huntsman's business, and spot sales are generally more profitable than contract sales. This evidence, according to Huntsman, supports a reasonable inference the most profitable transactions over the nine year period in question were *all* spot sales. By averaging the top-third profit margins, the argument continues, the jury reasonably determined an applicable profit margin for the lost spot sales. Based on our review of the record, we find no evidence establishing Huntsman's most profitable transactions over the nine years in question were all spot sales, or, more importantly, the average profit margin for those sales would likely have been earned at the time of each breach.

Huntsman concedes joint exhibits 1025 and 1048 do not identify which sales are spot sales. Huntsman further acknowledges no evidence was introduced

establishing the actual difference in the profit margin between spot sales and contract sales. Huntsman instead relies on testimony generally establishing spot sales had higher profit margins. Peter Huntsman, the president and CEO of Huntsman, said spot customers are "usually going to pay a premium," while Huntsman's purchasing director, Don Jennings, testified spot sales get "higher dollars" and have "really good prices." Szelc confirmed contract sales have a "slightly lower" profit margin than spot sales. Steve Burns, who was responsible for all of Huntsman's sales in North and South America from 2011 to 2019, described spot sales as "some of [our] more profitable business."

Explaining the different types of Huntsman's customers, Burns said spot customers were the "top of the pyramid." He was referring to an exhibit depicting Huntsman's customers in a pyramid divided between "Contract Customers" and "Spot Customers." Most of the pyramid is occupied by contract customers, who Burns said are about two-thirds of Huntsman's business. Spot customers provide the remaining one-third and, as Burns described, are at the "top of the pyramid." However, when specifically asked about differences in profit margins between the two customer groups, Burns used more general terms:

> Generally, the contract customers would be – would get a better deal as part of their commitment to us. A spot customer that just, you know, sort of showed up occasionally tended to get a higher price than someone who made a commitment to us to buy over a long period of time.

Szelc was similarly asked if "the highest margin sales [are] at the top of the pyramid," and she qualified her answer, "*On average* that is true." (Emphasis added.)

While the testimony establishes spot sales were generally more profitable than contract sales, it does not establish the top-third most profitable transactions were all spot sales. Spot sales "average" higher profit margins and are "some" of Huntsman's

more profitable business, but no witness testified all spot sales, across the board, were more profitable than even the most lucrative contract sale during the nine years in question. The dissent finds the jury "could reasonably infer the spot sales were the sales with the higher profit margins and chosen to utilize the top one-third of profit margins in the spreadsheets." *Huntsman International, L.L.C. v. Praxair, Inc.*, 24-0627 (La. 1/___/25), ___ So. 3d __, ___ (Knoll, J., dissenting). For that statement to be correct, the profit margin for every spot sale made by Huntsman during the nine years in question would have to be higher than the profit margin for every contract sale. This is not a reasonable inference from testimony only establishing spot sales "average" higher profit margins than contract sales. The Huntsman executives who testified at trial, as well as their damage expert, could have readily confirmed the top-third most profitable transactions in exhibits 1025 and 1048 were all spot sales if that information were true. They did not.

More importantly, even if the top-third transactions were all spot sales, Huntsman did not prove these highest-margin transactions likely would have been repeated every time a breach occurred. Spot sales, being opportunistic in nature, are particularly sensitive to supply and demand at any given time. As recognized by Peter Huntsman:

> [Spot sales] will depend if we have availability, if you have the opportunities that will match. Sometimes when the economy is very slow, this spot opportunity isn't there. Other [times], as you've seen in some of these messages where it says if demand is exceeding supply, we're able to move every ounce we could move. That's because there's a very high demand.

Regardless of the type of sale, profit margins fluctuated over time depending on demand, cost of raw materials, and other market conditions. Demand for particular products changed so frequently Huntsman used a sales and operation plan to constantly update its product mix. Burns explained the ongoing process of matching products to ever-changing customer demand:

10

A. So we had over hundreds and hundreds, probably 6,700 customers that we sold our MDI products to. Had hundreds and hundreds of different types of MDI products that we sold. Many of them were very specialized, customized for a specific customer's application. And they were across, again, a wide variety of industries.

\* \* \*

Q. How do you coordinate all of that to make sure you're making enough stuff, making the right stuff and also selling it?

A. Yeah. So, the process we use was our sales and operations plan. And that was how we married the mix of products that the plan[t] would produce with the list of products we intend to sell our customer. That process matched the two together.

\* \* \*

Q. Why can't you just show up at the plant, make a bunch of MDI? You know why do you need this?

A. Well, it gets back to the complexity of the business. The very high number of customers, the very high number of products and the specialty nature of so many of those products. It's very complicated. The manufacture of the different MDI grades is pretty complicated.

Huntsman was "constantly editing and updating that plan," which Burns described as "sort of a living document that we are making sure is accurate because that's how we're going to be able to sell everything we want to sell."

The top-third method for calculating profit margins completely disregards these fluctuations in product demand and market conditions. It assumes, without evidence, the most profitable transactions would have been repeated each and every time a breach occurred, regardless of the market conditions. Huntsman argues the jury's determination is supported by exhibits 1025 and 1048, but a review of those spreadsheets reveals the absence of evidence supporting the top-third method.

Exhibit 1025 summarizes aniline sales, but the bulk of the jury's award is for lost profits from MDI sales, which is the subject of exhibit 1048. This lengthy spreadsheet contains monthly summaries of MDI sales by product type and includes sales volume and profit margins for the transactions. Most of the top-third MDI

11

sales have a profit margin of less than $0.50 per pound. The average profit margin, however, is heavily skewed by a relative handful of atypical and infrequent transactions that increase the top-third's average profit margin to over $0.80 per pound. For example, the highest profit margin identified in exhibit 1048 is $30.08 per pound for a transaction in September, 2009. The product type is generically identified as "others." The top-third method assumes this non-descript product would have been sold for a profit margin of over $30 per pound every time a breach occurred. No evidence supports this assumption. The top ten most profitable sales in exhibit 1048 have an average profit margin of over $9.00 per pound, about eleven times the top-third average. These transactions likewise include multiple entries of product types simply labeled "others." Again, the record establishes no demand for these products at those profit margins each time a breach occurred.

As previously stated, exhibits 1025 and 1048 do not distinguish between spot sales and contract sales. The record contains little evidence of an actual profit margin for any spot sale, but the limited proof available likewise does not support the average figure produced by the top-third method. In a 2012 email, a Huntsman employee advised Burns of a lost spot sale. The email confirms the profit margin for prior sales of the product to the customer was $0.60 per pound. Burns described that transaction as "a very profitable sale" and noted the customer, along with others named in the email, "were amongst our more profitable customer[s], or our most profitable customers." However, according to the top-third method, this "very profitable sale" to one of Huntsman's "most profitable customers" is actually a below-average sale, over $0.20 less than the $0.82 per pound average calculated by the top-third method. Burns's description of the lost sale's profit margin does not suggest a below-average transaction.

The dissent maintains the "highest" prices are appropriate to determine lost profits for all breaches because witnesses testified the market was "hot" in 2006, 2012, and 2013, three of the nine years in question. *Huntsman International, L.L.C.*, ___ So. 3d at ___ (Knoll, J., dissenting). This ignores the obvious corollary of that testimony: the market was *not hot* during the remaining six years. During those six years, the dissent assumes, again without evidence, the highest profit margin transactions would have been repeated each and every time a breach occurred, regardless of market conditions. No testimony or documentary evidence supports that finding.

Based upon our review of the record, counsel's proposed method for determining a profit margin for lost sales is not reasonably supported by the evidence or justifiable inferences drawn therefrom. *See Olympia Minerals*, *LLC*, 171 So. 3d at 902-03; *Walker*, 509 So. 2d at 172. In contrast to Szelc's month-by-month approach, which relies on sales proximal to a breach, the top-third method uses the most profitable sales over the course of almost a decade, regardless of when they occurred and under what market conditions, to arrive at a single profit margin for all lost sales. Without evidence of demand for those products at those margins at the time of each breach, this approach fails to prove lost profits with reasonable certainty and rests on speculation and conjecture. *See Cox*, 338 So. 3d at 1157; *George W. Garig*, 226 La. at 130; 75 So. 2d at 33; *Mabry v. Midland Valley Lumber Co.*, 217 La. 877, 890; 47 So. 2d 673, 677 (1950); *Tidwell v. Meyer Bros.*, 160 La. 778, 788-89; 107 So. 571, 575 (1926). The jury thus abused its discretion by awarding lost profits of $88,117,405. *Id.*; *see also Olympia Minerals, LLC*, 171 So. 3d at 902-03; *Walker*, 509 So. 2d at 172.

Szelc's lost-profit figure may be closer to the floor than the ceiling, but she provided the only calculation reasonably supported by the evidence. She testified in

detail about her methodology, research, and related work culminating in her conclusion Huntsman sustained lost profits of $37,522,291. Given the changing product demand and market conditions, Szelc calculated profit margins for each month based on transactions occurring during that month. The proximity to each breach allows a reasonable inference that, absent a breach, additional production of the same products could have been sold for the same profit margins at that time. This evidence establishes with reasonable certainty lost profits of $37,522,291.

## CONCLUSION

The judgments of the trial court and court of appeal are amended in part to reduce the award of lost profits in favor of Huntsman International, LLC against Praxair, Inc. to $37,522,291.

**AMENDED IN PART**.

# SUPREME COURT OF LOUISIANA

## No. 2024-C-00627

## HUNTSMAN INTERNATIONAL, L.L.C. AND RUBICON, L.L.C.

## VS.

## PRAXAIR, INC.

On Writ of Certiorari to the Court of Appeal, Fourth Circuit,
Parish of Orleans Civil

**KNOLL, Justice *Pro Tempore*,[1] dissents and assigns reasons.**

I respectfully dissent from the majority opinion and would affirm the jury's award for lost profits. This breach of a contract case concerns the reasonableness of the jury's monetary award for lost profits. In my view, the jury did not abuse its wide discretion by awarding lost profits which were established with reasonable certainty.

The formula for lost profits provided by the expert for Huntsman International, L.L.C ("Huntsman"), Rebecca Szelc, was to multiply lost sales (measured in pounds of product) by a profit margin per pound. Primarily by using daily downtime reports, she determined Huntsman had a loss of production of 97,675,260 pounds of methylene diphenyl diisocyanate ("MDI") products and 29,741,887 pounds of aniline. Using spreadsheets provided by Huntsman, Ms. Szelc computed the profit margin for the MDI to be $0.36 per pound and the profit margin for the aniline to be $0.08 per pound. In this manner, she determined Huntsman's lost profits were at least $37,522,291.

During her testimony, Ms. Szelc explained the basis and methodology for her calculations. She also explained conservative adjustments she made to the factors of that calculation. Relative to the first factor, lost production, she explained "arguably

---

[1] * Justice Jeannette Theriot Knoll, retired, appointed Justice *Pro Tempore*, sitting for the vacancy in Louisiana Supreme Court District 3.

you could say that lost production equals lost sales, because ultimately in a plant that sells everything it makes, it's going to." However, Ms. Szelc made adjustments to calculate down from lost production to lost sales. For example, from the downtime reports, Ms. Szelc's determined there were 268 days of lost production. She then subtracted or "wiped out" 25 days where, according to the downtime reports, there were occurrences in addition to Praxair Inc.'s ("Praxair") failure to supply products causing the downtime on that particular day. Ms. Szelc testified, for example, there were "days where multiple things were going on, and while we know there was some lost production from the loss of H2 or CO, we couldn't identify it with specificity[.]" She also "wiped out" 42 days to account for inventory or demand issues. Thus, Ms. Szelc utilized 201 days of lost production in her loss profits formula.

Ms. Szelc also addressed her calculation of the second factor of lost profits, profit margin. It was Ms. Szelc's testimony that in computing the profit margins, she used "the monthly actual contribution margins that were weighted averages of all the products that [Huntsman] sold during that month at the profit margin that they sold them." That weighted average included both contract sales and spot sales. Notably, contract sales, comprising two-thirds of Huntsman's business, have lower profit margins. Comparatively, spot sales constitute one-third of sales and have higher profit margins.[2] According to the evidence, the sales lost during the relevant time period were spot sales.[3] By Ms. Szelc's own admission, "by definition[,] that weighted average contribution margin is going to be made up of mostly contract

---

[2] Employees of Huntsman including Peter Huntsman (President and CEO of Huntsman International, LLC), Steve Burns (Vice President of the polyurethane business responsible for sales in the Americas from 2011 to 2019), Don Jennings (purchasing director), and Mark Dearman (plant general manager) testified that spot sales make up the top one-third of Huntsman's sales, have the highest profit margins, and are the most profitable. Mr. Huntsman testified that spot sales customers "pay a premium." It was Mr. Burn's testimony that spot sales are "the top of the pyramid" of sales, as was shown to the jury in the form of a pyramid chart.

[3] Ms. Szelc testified when there was a supply interruption, the lost pounds of production were taken away from what would have been spot sales. Mr. Huntsman, Mr. Jennings, and Mr. Burns confirmed this fact.

sales so it will be at a slightly lower or – its going to be at a lower contribution margin." She confirmed, because the losses sustained by Huntsman came from the top of the pyramid chart, there is reason to believe those loses were at higher profit margin losses than what the average would be. Ms. Szelc also identified items she did not include in her damage calculation including, for example, damages for lost relationships with customers, lost reputation, lost business opportunities, and reduced sales prices. Undisputedly, based upon her testimony, Ms. Szelc's calculation of lost profits was "conservative[,]" "underrepresent[ed]" the lost profits, and "much closer to the floor than to the ceiling[.]"[4]

In rendering its award of lost profits, the jury was free to accept or reject all or part of Ms. Szelc's testimony. It was free to accept or reject the adjustments she made to her computation for the amount of lost production. The jury had the downtime reports which were discussed in detail to ensure their understanding. This is further true given the testimony of the Huntsman employees discussed below.

The jury was further free to accept or reject Ms. Szelc's testimony relative to the profit margins utilized in her lost profits calculation. The jury was at liberty to conclude Ms. Szelc's profit margins were too low and to utilize higher profit margins to calculate lost profits.[5] The jury had the benefit of evidence including all MDI and aniline sales over the nine-plus years along with product type and individual sales, the sale date, volume, profit margin, and product codes. It also had the benefit of Ms. Szelc's detailed testimony explaining what the spreadsheet columns represented and how to interpret the abbreviations. Although the spreadsheets did not identify the

---

[4] Ms. Szelc testified: "Because of all the things we've spoken about where I made conservative determinations, the margin that I [u]sed the fact that my damages claim for example doesn't capture the long-term impact of turning customers away, I would say this much closer to the floor than the ceiling."

[5] "The trier of fact may accept or reject any expert's opinion, in whole or in part, and may substitute its common sense and judgment for the expert's opinion when the substitution appears warranted on the record as a whole." *Johnston v. Vincent*, 21-1196, p. 29 (La. 2/1/23), 359 So.3d 896, 916.

spot sales, the jury was informed that spot sales comprise one-third of sales and are the most profitable. Accordingly, the jury could reasonably infer the spot sales were the sales with the higher profit margins and chosen to utilize the top one-third of profit margins on the spreadsheets. The totality of evidence before the jury, including the spreadsheet figures, provided a *reasonably certainty* of the profit margin component for the jury to input a profit margin that differed from Ms. Szelc's into its lost profits calculation.

> The mere fact that an event did not happen already indicates the difficulty, or perhaps impossibility, of showing with absolute certainty that it would have happened had the circumstances been different. That is why, in the contemporary and more flexible approach, it suffices for a party to a contract to prove only with *reasonable certainty* the profit of which he has been deprived because of the other party's failure to perform an obligation.

Litvinoff and Scalise, 6 La. Civ. L. Treatise, *Law of Obligations*, § 4.9 (2d ed.).

Admittedly, the spreadsheets were extremely lengthy; however, this was not an unsophisticated jury. The jury was somewhat sophisticated, with at least four jurors possessing college degrees, including an accountant and a registered nurse. Moreover, this Court recently reiterated "the important role of juries" and its "'[c]onfidence in juries, and their ability to handle and decide difficult, factual questions[.]'" *Eastman v. State Farm Mut. Auto. Ins. Co.*, 23-1107, p. 8 (La. 5/1/24), 384 So.3d 865, 872 (quoting *CD v. SC*, 22-961, p. 4, n.5 (La. 6/1/23), 366 So.3d 1245, 1249). The *Eastman* Court stated: "'We hold juries in high regard and accord them great deference in their decisions.'" *Id.* (quoting *CD*, 366 So.3d at 1249). The *Eastman* Court further opined:

> [T]he wisdom of a single expert is often less than the collective wisdom of a diverse and independent group of individuals. Trial by jury is understood as relying, at least in part, on this "wisdom of the crowd." This point, and others, underlies the great deference our Civil law system affords to jury decisions.

*Id*. at 868 (footnote omitted). In this case, the "wisdom of the crowd" should be given due difference, and the jury's award of lost profits affirmed.

4

Importantly, as recognized in *Barber Brothers Contracting Company, LLC v. Capital City Produce Company, LLC*, 23-788 (La. 12/19/24), 2024 WL 5162733 *15 (Knoll, J., concurring) "the jury represents the community's input in the judicial system in achieving justice in a particular case":

> [T]he jury trial plays a major role in achieving an important societal policy which the law is designed to foster: satisfaction of the community's sense of what is fair and just. […] Criticisms of jury trials as costly and of jury decisions as sometimes irrational, although valid observations, must be weighed against the societal good which is achieved by the resolution of disputes through jury trials.
>
> Frank L. Maraist, 1 La. Civ. L. Treatise, *Civil Procedure* § 11:2 (2d ed.) (November 2021 Update).

*Id.*

Relative to the amount the jury ultimately awarded Huntsman for lost profits, as previously stated, I find the jury's award of lost profits was established with the requisite reasonable certainty. As the CA recognized:

> "As a general rule[,] 'damages for loss of profits may not be based on speculation and conjecture; however, such damages need be proven only within reasonable certainty.'" *PVCA, Inc. v. Pacific West TD Fund LP*, 20-0327, p. 14 (La. App. 4 Cir. 1/20/21), 313 So.3d 320, 331 (quoting *Breton Sound Oyster Co.*, 17-0955, p. 14, 299 So.3d at 90). "Broad latitude is given in proving lost profits because this element of damages is often difficult to prove and mathematical certainty or precision is not required." *Id.* "The plaintiff bears the burden of proving entitlement to special damages by a preponderance of the evidence." *Cox, Cox, Filo, Camel & Wilson, LLC*, 21-00566, p. 11, 338 So.3d at 1157 (first citing *Breaux v. Woods*, 20-0161, p. 8 (La. App. 3 Cir. 11/18/20), 307 So.3d 395, 402; and then citing *Caruso v. Acad. Sports & Outdoors*, 18-0496, p. 7 (La. App. 5 Cir. 4/24/19), 271 So.3d 355, 362). "That is, the plaintiff must show that the loss of profits is more probable than not." *Breton Sound Oyster Co.*, 17-0955, p. 14, 299 So.3d at 90 (quoting *Wasco, Inc. v. Econ. Dev. Unit, Inc.*, 461 So.2d 1055, 1057 (La. App. 4th Cir. 1985)). Moreover, if the defendants do not refute the evidence offered by the plaintiffs to prove their special damages, and the record supports the plaintiffs' assertion, the district court does not err if it awards those damages. *See Cox Commc'ns v. Tommy Bowman Roofing, LLC,* 04-1666, p. 9 (La. App. 4 Cir. 3/15/06), 929 So.2d 161, 167.

*Huntsman International, L.L.C. v. Praxair, Inc.*, 22-777 (La.App. 4 Cir. 4/19/24), 2024 WL 1695071 *7.

In the instant matter, the jury heard no testimony to either refute Ms. Szelc's damages model generally or challenge that the model was conservative and admittedly underestimated Huntsman's lost profits. Indeed, the jury heard ample testimony of Huntsman employees supporting the insufficient total of Ms. Szelc's computation. For example, Mr. Jennings testified Ms. Szelc's calculation of lost profits was "the rock bottom[.]" He explained Huntsman identified more days of lost production than what Ms. Szelc used in her final calculation. He also explained the number of pounds of production and the profit margin she utilized were low numbers. According to Mr. Jennings, during much of the relevant time, Huntsman was in a sold-out market, and it would have been selling at higher amounts. For these reasons, in his opinion, Ms. Szelc's numbers are "the bare minimum."

Mr. Huntsman also testified about consequences resulting from Praxair's failure to supply Huntsman products. As a result thereof, Huntsman had to keep their prices higher than their competitors, which initially resulted in a loss of customers. However, in his words, Huntsman "los[es] out twice on the customer." Mr. Huntsman explained Huntsman then had to subsequently adjust its prices in an attempt to regain the loss by "giv[ing] them a discount or some sort of incentive to come back to [Huntsman] and regain what [they] have lost." The jury also heard from Mr. Huntsman, an additional consequence of a lack of supply was that Huntsman had to run the plant at minimum rates of production. Due to fixed costs, and the production of fewer pounds, the pounds being produced became more costly. Consequently, Huntsman may not have had the supply to sell to their customers, and the remaining pounds, when operating at these low levels, would "exponentially become more and more expensive."

6

The testimony of other Huntsman employees elaborated on effects of Praxair's breach. Mr. Burns confirmed, due to lost production, Huntsman's sales team had to impose a 14-day lead time. Because Huntsman could not deliver as the customer requested, the sale was lost and the customer purchased from a competitor. A second example he provided was the sales team "locking down the orders and not allowing [customer's] to, say, increase the amount or pull up the delivery date." That, again, resulted in customers finding the product from their competitor. Huntsman also at times adjusted pricing. Whereas the sales team traditionally had some leeway with the price charged to spot customers, when Huntsman was low on a product, it would demand full price; therefore, less customers would buy it. Mr. Burns also explained sometimes "sales limits" were utilized where the amount of the order that a customer could place would be capped at a certain amount. He provided detailed testimony explaining these actions resulted in chasing sales away from Huntsman's most profitable customers, spot sales. Moreover, some of these customers bought from competitors and did not return to Huntsman subsequently.

I further emphasize the profit margin for spot sales need not have been computed with exactitude, as it is often not susceptible to such a computation. Litvinoff and Scalise, 6 La. Civ. L. Treatise, *Law of Obligations*, § 8.9 ("In sum, once the evidence shows that the victim of a wrong, be it breach of contract or quasi-delict, has sustained damage, the law gives courts much, and even vast, discretion for the assessment of damages when no precise measurement thereof can be made."); La.Civ. Code art. 1999 ("When damages are insusceptible of precise measurement, much discretion shall be left to the court for the reasonable assessment of these damages."); *Rosenblath v. Louisiana Bank & Trust Co.*, 432 So.2d 285, 290 (La. App. 2d Cir. 1983) ("[T]he trier of fact must be afforded much discretion in the determination of such damages where the evidence clearly shows that damage is proven but not capable of proof to a mathematical or legal certainty.").

7

Ms. Szelc testified specifically about Huntsman's lack of records of lost spot sales. She explained, "most businesses don't track sales they didn't make." She was not expecting to be provided with a list of lost spot sales showing customers, order dates, product type and quantities because "[y]ou just don't find that." The lack of detailed records on lost spot sales, does not dictate the conclusion such sales were not proven as the majority opinion implies. The jury found lost spot sales were reasonably proven and it reasonably determined the appropriate profit margin to use in calculating lost profits.

The majority opinion appropriately acknowledges the relevancy of the market conditions, with which I agree. However, I note in this case, the jury heard uncontradicted testimony from Huntsman employees and Ms. Szelc this was a "hot market[,]" and Huntsman sold 99% of its production. Their testimony established profits on spot sales are at their highest when the market is "hot[,]" especially in 2006, 2012, and 2013, when demand was exceeding supply. Ms. Szelc also testified the market was "hot," where the global demand for MDI exceeded the available supply, specifically identifying the years of 2006, 2012, and 2013. She further opined because Huntsman was selling nearly all of the product it made throughout the relevant time period, the interruption of production due to Praxair's supply shortages had an even more pronounced impact on Huntsman's lost profits from potential sales at this time. The majority recognizes profit margins fluctuated over time depending on demand, cost of raw materials, and other market conditions; however, it fails to give due consideration to the evidence elicited from Ms. Szelc and the Huntsman employees that this was a "hot market[,]" and Huntsman was able to sell 99% of its production.

I agree with the District Court and the Court of Appeal majority that although the lost profits award is high, the jury's computation of the profit margins for spot sales for the relevant time period based on the actual spread sheet data to compute

8

lost profits provided a reasonable factual basis for the jury's conclusion, and its award of lost profits was not clearly wrong.

Accordingly, for the foregoing reasons, I respectfully dissent from the majority opinion. The record shows there was sufficient reasonable evidence for the jury to have accepted Ms. Szelc's lost profits formula, but to have rejected elements of the components thereto. Particularly the jury rejected her use of a weighted average calculation for the profit margins due to the inclusion of contract sales, which downwardly skewed the calculation. Ms. Szelc's expert testimony cannot usurp the role of the factfinder when their conclusions are based on a reasonable certainty. Thus, for these reasons, as more fully elaborated upon by the majority of the Court of Appeal in their excellent opinion, I would affirm the jury's award for lost profits.